# EXHIBIT A

## STATE-COURT PROCESS, PLEADINGS, AND ORDERS

## FORM 1.997.   CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.   CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>SEVENTEENTH</u>   JUDICIAL CIRCUIT, IN AND FOR <u>BROWARD</u>   COUNTY, FLORIDA

<u>DIRECTIONAL ADVERTISING SOLUTIONS INC</u>
Plaintiff

Case # _____
Judge _____

vs.
<u>JAL EQUITY CORP, ERAN SALU</u>
Defendant

### II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

- ☐ $8,000 or less
- ☐ $8,001 - $30,000
- ☐ $30,001- $50,000
- ☐ $50,001- $75,000
- ☐ $75,001 - $100,000
- ☒ over $100,000.00

### III.   TYPE OF CASE   (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☒ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**      **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**      **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

    <u>4</u>

**VI.**      **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**      **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**      **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**      **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Alexandra M Sierra De Varona</u>      Fla. Bar # <u>195928</u>
         Attorney or party                (Bar # if attorney)

<u>Alexandra M Sierra De Varona</u>               <u>02/09/2024</u>
  (type or print name)              Date

NOT AN OFFICIAL COPY - ATTORNEY - NOT AN OFFICIAL COPY

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a DAS GROUP
a Florida corporation

        Plaintiff,                      CASE NO._____

vs.

JAL EQUITY CORP, a Nevada
Corporation, and ERAN SALU,
Individually,

        Defendants.

_____/

**COMPLAINT**

    Plaintiff, DIRECTIONAL ADVERTISING SOLUTIONS, INC., d/b/a DAS GROUP, a

Florida corporation ("DAS" or "Plaintiff"), brings this action against Defendants, JAL EQUITY

CORP, ("JAL") and ERAN SALU, individually ("Salu"), and alleges:

**PARTIES, JURISDICTION AND VENUE**

    1.     This is an action for damages that exceed $50,000.00, exclusive of any claim for

interest, costs, and attorney's fees.

    2.     Plaintiff, DAS, is a Florida corporation with its principal place of business in St.

Lucie County, Florida.

    3.     Upon information and belief, Defendant, ERAN SALU, is an individual

domiciled in Florida, but which is subject to the jurisdiction of this court because he conducts

business in Broward County, Florida and committed the tortious acts alleged herein in Broward

County, Florida.

    4.     Defendant, JAL, is a Nevada Corporation with its principal place of business in

1

NEVADA, that conducts business in Florida and is subject to this Courts jurisdiction per the Venue and Jurisdiction provision in the Asset Purchase Agreement that is the subject of this case. *See Exhibit "A"* (the Agreement). As a consequence thereof, at all times material hereto, JAL is subject to the jurisdiction of this Court.

5.      Venue is proper in Broward County because the Asset Purchase Agreement in dispute includes a governing law provision placing venue and jurisdiction properly in Broward County, and because the tortious conduct alleged herein occurred in Broward County, Florida. *See id*.

6.      All conditions precedent to the bringing of this action have been satisfied, performed or waived.

### GENERAL ALLEGATIONS

7.      At all material times, DAS was a digital marketing firm specializing in local digital marketing programs for franchise organizations with national and regional multi-location brands.

8.      At all times material hereto, Karen Korner ("Korner") was acting on behalf of DAS as the Secretary and Treasurer, and Christina Parsons ("Parsons") was acting on behalf of DAS as CEO.

9.      On or about September 30, 2020, DAS entered into an agreement with Generational Equity, LLC ("Broker") to assist DAS with the sale of its business. The agreement between DAS and the Broker contained a success fee that was to be paid by DAS to the Broker based upon the total consideration to be received by DAS from the sale of its business or business' assets.

10.     On or about late Summer of 2021, JAL, through its Managing Director and

President, Defendant Eran Salu ("Salu"), actively sought to purchase DAS, and worked with DAS' Broker to purchase DAS' assets.

11. Salu had several meetings with Korner and Parsons on behalf of DAS. During these meetings Salu explained how he and JAL had experience in taking over companies and making them successful. Salu, individually and on behalf of JAL however, failed to inform DAS that he and JAL had a history of failing to pay companies the full amount of the purchase price for their assets when JAL purchases them. In fact, Salu individually and on behalf of JAL failed to inform DAS that JAL never had any intention of paying DAS the full purchase price for its assets.

12. During these meetings, the purchase price and structure of the payments were discussed. The parties came up with a purchase price that involved a $600,000.00 immediate payment from JAL to DAS, plus an earn out of up to $300,000.00 if certain metrics were reached, as well as an additional payment/adjustment based upon a working capital adjustment. At this time, DAS advised Salu that DAS' last audited accounting statements were for 2020, and provided those statements to JAL. DAS wanted additional time to close, however Salu, on behalf of JAL, insisted on closing on November 30, 2021 and represented to DAS that JAL was purchasing Parsons' talent and was not concerned with the financials.

13. Further, during these meetings attended by Korner and Parsons on behalf of DAS, as well as the Broker representative, Salu, individually and on behalf of JAL assured everyone that the purchase price was $2,300,000.00.

14. On or about November 30, 2021, DAS and JAL entered into the Asset Purchase Agreement (the "Agreement") wherein DAS was to sell all of its rights, title, and interest in and assets owned by DAS to JAL for the consideration specified in the Agreement. *See Exhibit "A"*

(the "Agreement").

15.     As a condition to entering into the Agreement, JAL insisted on keeping Parsons'

talents. Subsequently, JAL and Parsons entered into a separate Employment Agreement.

16.     Section 2.5 of the Agreement, titled Purchase Price, states in pertinent part:

> **The consideration paid by Company to Seller for the Assets (the "Purchase Price") consists of: (a) Six Hundred Thousand Dollars ($600,000) in immediately available funds(the "Cash Payment").**

*Id.*

17.     On or about November 30, 2021, JAL sent DAS a downpayment of $443,500.00,

which consists of the Purchase Price of $600,000.00 less the Broker Success Fee of $156,500.00

paid to Broker.

18.     The Broker's Success Fee was calculated as follows: 10% of the first million

($100,000.00) plus 8% of amount between $1 million and $2 million ($80,000.00), plus 6% of

amount between $2 and $3 million ($21,000.00), for a total Success Fee of $201,000.00. *See

Exhibit "B"* (the "Exit Plan Agreement"). Notably, the Broker Fee was calculated based on a

purchase price of $2,350,000.00, although DAS only received $600,000.00 down and the

earnouts had yet to occur.

19.     Per the Exit Plan Agreement with the Broker, an Exit Planning Fee paid by

Korner of $44,500.00 was subtracted from the Total Success Fee, for a Net Success Fee of

$156,500.00. *See Id.*

20.     Section 2.6 of the Agreement, titled Working Capital Adjustment, states in

pertinent part:

> **b. The Company will agree to assume the Accounts Payable, Accrued Expenses, Deferred Income and Business Debt on the final Balance Sheet ("Assumed Liabilities") as of the closing date. There will be a dollar for dollar increase in the Purchase Price paid with the Cash Payment at the end of the Reconciliation Period to the extent Assumed Liabilities at the Closing Date is less than $1,450,000. C. The Company will receive all Accounts Receivable and Prepaid Expenses ("Working Capital") at Closing. There**

4

> **will be a dollar for dollar increase in the Purchase Price paid with the Cash Payment at end of the Reconciliation Period to the extent Working Capital at Closing is greater than $750,000.**

*See Exhibit "A"*

21.     At the time of the Closing, Assumed Liabilities were approximately $538,109.62, less than $1,450,000 by approximately $911,890.38, entitling DAS to a dollar for dollar increase in the Purchase Price for that amount which remains unpaid by JAL.

22.     At the time of the Closing, Working Capital was approximately $989,003.72, greater than $750,000 by approximately $239,003.72, entitling DAS to a dollar for dollar increase in the Purchase Price for that amount which remains unpaid by JAL.

23.     Pursuant to Section 2.2 of the Agreement, titled Excluded Assets, all amounts in the Seller's bank accounts as of the Agreement shall belong to the Seller. *See id.* On or about November 30, 2021, the total amount of funds left in DAS's bank accounts totaled approximately $456,118.90.

24.     On or about August 2022, Salu, on behalf of JAL, agreed that those funds belong to Seller, and reimbursed $300,000.00 to Korner, leaving a balance in DAS' accounts of approximately $156,118.90 still owed.

25.     Pursuant to Section 2.3 of the Agreement, titled Assumed Liabilities and Business Debt, JAL agreed to assume all trade accounts payable of the Business to third parties in connection with the business that remain unpaid as of the Closing Date and to make all connections to the merchant accounts to be effective 12/1/2021. *See id.* This includes all Amex credit card charges which credit cards fund the business (Plum, Gold, and Platinum) for media placements that are part of the accounts payable in connection with the business.

26.     On or about February 2022, after JAL was to have assumed payment of vendor accounts per Section 2.3 of the Agreement, JAL charged approximately $87,693.23 on DAS'

Amex plum and gold credit cards without the express authority to do so, in order to pay off the YELP account that JAL could not pay through its credit cards.

27.     All of DAS' Amex credit cards are guaranteed personally by Korner.

28.     To date, JAL received approximately $700,000 in receivables and have not made payment on the assumed payables. Worse yet, the payables were less at closing thereby requiring an additional adjustment in DAS' favor.

29.     JAL only tendered payment of $600,000 and received at least $700,000 in receivables. JAL has effectively been paid for the purchase of DAS and is refusing to reconcile what it owed to DAS. Consequently, DAS has been damaged.

<u>**COUNT I - BREACH OF CONTRACT**</u>

30.     Plaintiff re-alleges paragraphs 1-29 as it fully incorporated herein.

31.     This is an action for breach of contract.

32.     At all times material, there was a valid contract between DAS and JAL for the sale and purchase of DAS, as evidenced by the written Asset Purchase Agreement attached hereto as Exhibit "A".

33.     JAL has materially breached the Agreement by failing to pay the full purchase price pursuant to the Working Capital Adjustment terms of the Agreement and keeping and controlling funds belonging to DAS, and failing to reconcile all figures as required by Section 2.6 of the Agreement.

34.     As a direct, proximate, and foreseeable result, JAL's breach of the Agreement, DAS has been damaged.

WHEREFORE, Plaintiff, DIRECTIONAL ADVERTISING SOLUTIONS, INC. d/b/a DAS GROUP, a Florida corporation, demands judgment against Defendant, JAL EQUITY

CORP, for all damages, including special and consequential damages, together with interest, costs, and for any further relief this Honorable Court deems just and proper.

## COUNT II - FRAUDULENT MISREPRESENTATION
### (JAL & SALU)

35.    DAS restates and incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

36.    In order to induce DAS to enter into the Asset Purchase Agreement to sell the company to JAL, Salu, individually and on behalf of JAL, made a series of misrepresentations and omissions as described in paragraphs 11-13.

37.    Salu, individually and on behalf of JAL, knew these representations were false when made or, Salu made these misrepresentations and omissions without knowledge of their truth or falsity.

38.    Salu, individually and on behalf of JAL, made these misrepresentations and omissions with the intent that they induce DAS to act upon these misrepresentations and omissions.

39.    DAS justifiably relied on these misrepresentations and omissions to its detriment.

40.    As a result of DAS' justifiable reliance on these misrepresentations and omissions, DAS has been damaged.

WHEREFORE, Plaintiff, DIRECTIONAL ADVERTISING SOLUTIONS, INC. d/b/a DAS GROUP, demands judgment for damages against Defendants, JAL EQUITY CORP., and ERAN SALU, individually, costs, interest, and  any such other and further relief as this Honorable Court deems just and proper.

## COUNT III - NEGLIGENT MISREPRESENTATION
### (JAL & SALU)

7

41.     DAS restates and incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

42.     Salu, individually and on behalf of JAL, made a series of misrepresentations and omissions of material fact as described in paragraphs 11-13.

43.     Salu, individually and on behalf of JAL, either knew of the misrepresentations or omissions, made the misrepresentations or omissions without knowledge of its/their truth or falsity, or should have known the misrepresentations or omissions were false when made.

44.     Salu, individually and on behalf of JAL, intended that the above material misrepresentations and omissions would induce DAS to act upon them.

45.     DAS acted in justifiable reliance upon Salu's, individually and on behalf of JAL, misrepresentations or omissions to their detriment.

46.     As a result of DAS' justifiable reliance on these misrepresentations and omissions, DAS has been damaged.

WHEREFORE, Plaintiff, DIRECTIONAL ADVERTISING SOLUTIONS, INC. d/b/a DAS GROUP, demands judgment for damages against Defendants, JAL EQUITY CORP., and ERAN SALU, individually, its costs, interest, and  any such other and further relief as this Honorable Court deems just and proper.

## COUNT IV - ACCOUNTING
### (JAL)

47.     DAS restates and incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

48.     This is a complex transaction between JAL where DAS, a multimillion dollar company, is being sold to and purchased by JAL, in which the purchase price is to be calculated and added to by various different means and calculations for millions of dollars.

8

49.     Salu, individually and on behalf of JAL, and GE  owed fiduciary duties to DAS in connection with the acquisition of DAS in the following ways:

a.     Duty of Care;

b.     Duty of good faith and fair dealing; and

c.     Duty of loyalty.

50.     It is not clear that the remedy at law is as full, adequate and expeditious as it is in equity.

WHEREFORE, Plaintiff, DIRECTIONAL ADVERTISING SOLUTIONS, INC. d/b/a DAS GROUP, demands judgment against Defendant, JAL EQUITY CORP, for an accounting, costs, and any such other and further relief as this Honorable Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, DIRECTIONAL ADVERTISING SOLUTIONS, INC. d/b/a DAS GROUP, hereby demands trial by jury for all claims so triable as of right.

Dated: February 9, 2024.

DE VARONA LAW
Attorneys for the Plaintiff
4800 N. Federal Highway, Suite 104-D
Boca Raton, Florida 33431
Tel:    (561) 600-9070
Fax:    (561) 600-907

By: _/s/ Alexandra Sierra-De Varona_
ALEXANDRA   SIERRA-DE   VARONA,
ESQ.
Florida Bar No. 195928
asd@devaronalaw.com

# EX. "A"

### ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement"), dated as of November 30, 2021 is made between JAL Equity Corp, a Nevada S-Corporation ("Company"), Directional Advertising Solutions, Inc. d/b/a DAS Group, a Florida Corporation ("Seller") and Karen Korner and Christina Parsons (who are collectively referred to herein as the "Selling Shareholders").

### RECITALS

WHEREAS, Seller is a digital marketing firm specializing in local digital marketing programs for franchise organizations and national and regional multi-location brands. (collectively, the "Business");

WHEREAS, Seller desires to sell all of its right, title and interest in and to substantially all of the assets owned or used or held for use by Seller, whether tangible or intangible, of every kind whatsoever, including all those relating to or used in connection with, or useful or necessary for the conduct of, or otherwise material to the Business wherever located, and the goodwill pertaining thereto ("Assets");

WHEREAS, subject to the terms and conditions hereof, Company desires to purchase the Assets for the consideration specified herein.

WHEREAS, as a condition and inducement to Company to enter into this Agreement, Christina Parsons will  agree to enter into an Employment Agreement in the form attached hereto as Exhibit A (the "Employment Agreement)

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the provisions set forth below, and subject to the terms and conditions set forth herein, the parties agree as follows:

### ARTICLE II
### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES; CLOSING

**SECTION 2.1 SALE OF ASSETS.**  Subject to the provisions of this Agreement, Seller agrees to sell, and Company agrees to purchase, at the Closing, as defined herein, all of Seller's right, title and interest in and to the Assets, including, without limitation:

    (a)  All physical assets owned or used by Seller (collectively, "Equipment"), including, without limitation, the Equipment set forth on Schedule 2.1(a

    (b)   All accounts receivable, loans receivable and customer advances of the Business (collectively, "Accounts Receivable"), including, without limitation, the Accounts Receivable set forth on Schedule 2.1(b)

(c)      All oral and written contracts, understandings, arrangements, purchase orders, backlog and other agreements with customers to which Seller is a party (collectively, "Customer Contracts"), including, without limitation, the Customer Contracts with those parties set forth on Schedule 2.1(c);

(d)      All of the Seller's trademarks, trademark applications, trade names, service marks, service mark applications, Internet domain names, registered copyrights and copyright registrations, patents, patent applications and applications made or taken under federal, state, local and foreign laws by the Seller and used by the Seller in the Business or otherwise included in the Assets (collectively, "Intellectual Property"), including, without limitation, the Intellectual Property set forth on Schedule 2.1(d);

(e)      All refundable deposits and other prepaid expenses ("Prepaid Expenses"), including, without limitation, the Prepaid Expenses with those parties set forth on Schedule 2.1(e);

(f)      All of Seller's goodwill; and

**SECTION 2.2 EXCLUDED ASSETS.**  All amounts in the Seller's bank accounts as of the date of the Agreement shall belong to the Seller.  Excluded assets should also include (life insurance cash value, Bonvoy resort, Amex points, personal cell phones, computers (desktops, laptops and tablets used by Sellers and their immediate family members).

**SECTION 2.3 ASSUMED LIABLITIES AND BUSINESS DEBT.** Subject to the terms and conditions set forth herein, at the Closing Date, Company shall assume and agree to pay, perform and discharge when due the following:

(a)      All trade accounts payable of the Business to third parties in connection with the Business that remain unpaid as of the Closing Date (collectively, "Accounts Payable"), including, without limitation, the accounts payable set forth on Schedule 2.3(a); Company agrees to make all connections to the merchant accounts to be effective 12/1/2021.

(b)      Company agrees to assume all accrued vacation (Paycor report on PTO and benefits), accrued sales commissions, accrued payroll and payroll taxes and other accrued expenses of the Business as of the Closing Date (collectively, "Accrued Liabilities"), including, without limitation, the Accrued Expenses set forth on Schedule 2.3(b) , Seller will be responsible for paying employee payroll through 11/30/2021.

(c)      Deferred Revenues.  All obligations to customers resulting from prepayment by said customers for goods or services as set forth on Schedule 2.3(c).

(d)      All business debts of the Business as of the Closing Date (collectively "Business Debt"), including, without limitation, the Debts set forth on Schedule 2.3(d); This will include all invoices received prior to the closing date covering media placements or services which occurred prior to the closing date.
.

**SECTION 2.4 ASSUMED CONTRACTS.** Company shall assume and agree to pay, perform and discharge only the liabilities and obligations of Seller from the Closing Date for the contracts that are set forth on Schedule 2.4.

**SECTION 2.5 PURCHASE PRICE.**

The consideration paid by Company to Seller for the Assets (the "Purchase Price") consists of:

(a)      Six Hundred Thousand Dollars ($600,000) in immediately available funds (the "Cash Payment").

(b)      Company agrees to pay Seller or its assigns an Earn-out of up to $300,000 as follows:

(i)      If United States generally accepted accounting principles ("GAAP") revenues for the first twelve months after the Closing Date ("Period 1") exceed $7,000,000, an Earn-out payment of $100,000 will be made; If GAAP Revenues for Period 1 are between $6,500,000 and $7,000,000, an Earn-out payment of $50,000 will be made; If GAAP Revenues for Period 1 are under $6,500,000, no Earn-out payment will be made;

(ii)      If GAAP Revenues for the second twelve months after the Closing Date ("Period 2") exceed $7,000,000, an Earn-out payment of $100,000 will be made; If GAAP Revenues for Period 2 are between $6,500,000 and $7,000,000, an Earn-out payment of $50,000 will be made; If GAAP Revenues for Period 2 are under $6,500,000, no Earn-out payment will be made;

(iii)      If GAAP Revenues for the third twelve months after the Closing Date ("Period 3") exceed $7,000,000, an Earn-out payment of $100,000 will be made; If GAAP Revenues for Period 3 are between $6,500,000 and $7,000,000, an Earn-out payment of $50,000 will be made; If GAAP Revenues for Period 3 are under $6,500,000, no Earn-out payment will be made;

(iv)      In the event: (i) the Company sells all or substantially all of the Business, or (ii) if Eran Salu ceases to have more than a minimum 10% stake in the Company, or (iii) Christina Parsons is fired without cause or demoted during the three year Earn out period (each an "Acceleration Event"), then the Company agrees to pay to Seller all amounts which could still be earned under the Earn-out on the date of the Acceleration Event.

**SECTION 2.6 WORKING CAPITAL ADJUSTMENT.**

(a)      Within ninety (90) days following the Closing Date (the "Reconciliation Period"), the Seller and Company Will work together to product an updated balance sheet of the Seller as of the Closing Date (the "Final Balance Sheet").

b.   The Company will agree to assume the Accounts Payable, Accrued Expenses, Deferred Income and Business Debt on the Final Balance Sheet ("Assumed Liabilities") as of the Closing Date. There will be a dollar for dollar increase in the Purchase Price paid with the

Cash Payment at end of the Reconciliation Period to the extent Assumed Liabilities at Closing is less than $1,450,000. There will be a dollar for dollar decrease in the Purchase Price paid in Cash Payment at the end of the Reconciliation Period to the extent Assumed Liabilities at the Closing Date is more than $1,450,000.

c. The Company will receive all Accounts Receivable and Prepaid Expenses ("Working Capital") at Closing. There will be a dollar for dollar increase in the Purchase Price paid with the Cash Payment at end of the Reconciliation Period to the extent Working Capital at Closing is greater than $750,000. There will be a dollar for dollar decrease in the Purchase Price paid in Cash Payment at end of the Reconciliation Period to the extent Working Capital at the Closing Date is less than $750,000.

**SECTION 2.7 ALLOCATION OF PURCHASE PRICE.** Company and Seller agree that the Purchase Price shall be allocated as set forth on Schedule 2.6 (the "Allocation Schedule 2.7). The Allocation Schedule shall be deemed final after December 31, 2021 and Company and Seller agree to file their respective Internal Revenue Service Forms 8594 and all federal, state and local Tax Returns in accordance with the Allocation Schedule. Both Seller and Company will agree to report the same allocations to the IRS.

**SECTION 2.8 TIME AND PLACE OF CLOSING.** The closing of the purchase and sale provided for in this Agreement ("Closing") shall be held remotely on Tuesday, November 30, 2021 and shall be effective as of the date hereof, or at such other place or earlier or later date or time as may be fixed by mutual written agreement of Company and Seller ("Closing Date").

**SECTION 2.9 DELIVERIES AT CLOSING.** In addition to the other requirements set forth herein and, on the terms, and subject to the conditions set forth in this Agreement, at the Closing:

(a) Company, Seller, and Selling Shareholders shall execute and deliver this Agreement;

(b) Company and Christina Parsons shall execute the Employment Agreement;

(c) Company shall wire the Cash Payment to the Seller at an account designated by Seller.

**ARTICLE III**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AND SELLING SHAREHOLDERS**

Seller and Selling Shareholders jointly and severally, hereby represent and warrant to Company, that:

**SECTION 3.1 ORGANIZATION AND GOOD STANDING.** Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida with full corporate power and authority to own or lease their properties and to conduct their business in the manner and in the places where such properties are owned or leased, or such business is currently conducted.

**SECTION 3.2 AUTHORITY; NO BREACH.** All action necessary for the Seller's authority to enter into this Agreement and to carry out the transactions contemplated by the Agreement (the "Transactions") has been validly accomplished by the Seller and Selling Shareholders or shall be ratified by a court of competent jurisdiction. The execution, delivery and performance by Seller of this Agreement will not:

(i)      violate any laws of the United States, or any state or other jurisdiction applicable to Seller or require Seller to obtain any approval, consent or waiver of, or make any filing with, any person or entity (governmental or otherwise) that has not been obtained or made;

(ii)      result in a violation or any breach of, constitute a default (or an event which with notice or lapse of time or both would become a default) under, result in the acceleration of any indebtedness under or performance required by, result in any right of termination of, increase any amounts payable under, decrease any amounts receivable under, change any other rights pursuant to, or conflict with, any material note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Seller is a party or by which it or its properties is bound; or

(iii)      result in the creation or imposition of any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security agreement, right of first refusal, option, restriction, tenancy, license, covenant, right-of-way, easement or other encumbrance (including the filing of, or agreement to give, any financing statement under the UCC or any other Law of any jurisdiction) ("Encumbrances") or restriction upon any of the Assets.

SECTION 3.3 TITLE.  Seller has good title to the Assets and on the Closing Date will transfer and convey good and valid title to such Assets to Company, free and clear of any Encumbrances, liens, pledges, security interests, claims or rights of others of any kind or nature whatsoever.

SECTION 3.4 SUBSIDIARIES.  Seller and/or Selling Shareholders do not have any subsidiaries or any other equity interest in any corporation, partnership or similar entity that relates in any way to Seller.

SECTION 3.5 BUSINESS INFORMATION. Seller and Selling Shareholders represent and warranty that the information related to the Assets or the Business as set forth on Schedule 3.5 is true and correct in all material respects to the best of their knowledge.

SECTION 3.6 ABSENCE OF UNDISCLOSED LIABILITIES.  Except for the Assumed Contracts and as reflected on the Business Information set forth on Schedule 3.5 there are no Liabilities of Seller, whether absolute, accrued, contingent or otherwise, and whether due or to become due.

SECTION 3.7 EQUIPMENT AND OTHER PERSONAL PROPERTY.  Seller owns all the Equipment, except for any equipment described in the Assumed Contracts. All such Equipment is sold "as is, where is," but is sufficient to carry on the business of Seller in the normal course as it is presently conducted on the day of Closing.

SECTION 3.8  INTELLECTUAL PROPERTY.

(a)      Seller's Intellectual Property consists solely of items and rights which (i) Seller owns or (ii) Seller and its successors have the right to use pursuant to valid licenses.  Seller has all rights in the Intellectual Property included in the Assets necessary to carry out the Business as previously and currently conducted.

(b)      No claims (i) challenging the validity of or ownership by the Seller of any of the Intellectual Property included in the Assets, or (ii) to the effect that the use, distribution, licensing, sublicensing or sale by the Seller, infringes on any intellectual property or other proprietary right of any Person have been

asserted or are threatened by any Person, nor are there any valid grounds for any bona fide claim of any such kind. To Seller's knowledge, there is no unauthorized use, infringement or misappropriation of any of the Intellectual Property included in the Assets by any third party, employee or former employee. Seller has taken reasonable precautions to protect the Intellectual Property included in the Assets.

(c)     There are no royalties, fees or other payments payable by Seller to any person or entity by reason of the ownership, development, use, license, sale or disposition of the Intellectual Property.

(d)     All personnel, including employees, agents, consultants and contractors, who have contributed to or participated in the conception and development of the Intellectual Property on behalf of Seller either (i) have been a party to a "work-for-hire" arrangement or agreements with Seller in accordance with applicable national and state law that has accorded Seller exclusive and original ownership of all tangible and intangible property thereby arising, or (ii) have executed appropriate instruments of assignment in favor of the Seller as assignee that have conveyed to Seller exclusive ownership of all tangible and intangible property arising from them.

(e)     Schedule 3.8(e) sets forth a true and complete list of all of Seller's Software included in the Assets, excluding standard "off-the-shelf" Software for which the Seller has not paid and does not anticipate paying more than $1,000 in license fees or royalties.  Seller owns full and unencumbered right and good, valid and marketable title to the Software owned by it, free and clear of all mortgages, pledges, liens, security interests, conditional sales agreements, Encumbrances or charges of any kind.

(f)     Seller's Intellectual Property, including its rights to Software, is sufficient to carry on the business of Seller in the normal course as it is presently conducted on the day of Closing.

(g)     Schedule 3.8(g) sets forth the addresses, email addresses and phone numbers currently used by Seller.

**SECTION 3.9 INVENTORY.**  Seller owns all the Inventory.  All such Inventory is sold to Company "as is, where is."

**SECTION 3.10 EMPLOYMENT MATTERS.**  Schedule 3.10  sets forth a true, complete and correct list of (i) all employees of Seller, (ii) the position, date of hire, current annual rate of compensation (or compensation) with respect to employees compensated on an hourly or per diem basis, the hourly or per diem rate of compensation), including any bonus, contingent or deferred compensation, and  (iii) the  total compensation for each employee during the periods beginning on January 1, 2021 ending on October 31, 2021, including any bonus, contingent or deferred compensation.  No executive or key employee of Seller and no group of employees or contractors of any Seller has informed Seller (whether orally or in writing) of any plan to terminate employment with or services for Seller, and, to the knowledge of Seller, no employee or contractor has any plans to terminate employment with the Seller.

**SECTION 3.11 COMPLIANCE WITH LAWS.**  The operation, conduct and ownership of the property or business of Seller are being, and always have been, conducted, in all material respects, in full compliance with all federal, state, local and other (domestic and foreign) laws, rules, regulations and ordinances and all judgments and orders of any court, arbitrator or governmental authority applicable to it.

**SECTION 3.12 LITIGATION.** There is no legal, administrative, arbitration or other proceeding, or any governmental investigation, pending or, to the knowledge of Seller, threatened against or otherwise affecting Seller, or any of its assets, and Seller is not aware of any fact that might be expected to form the basis for any such proceeding or investigation relating in any way to Seller.

**SECTION 3.13 TAXES.** There are no liens for Taxes due and payable upon, or threatened against or in connection with, any of the Assets. To Seller's knowledge there are no outstanding rulings of, or requests for rulings with, any Tax authority expressly addressed to the Seller or any related Person of the Seller that are, or if issued would be, binding upon any company for any Tax period or portion thereof beginning after the Closing Date.

**SECTION 3.14 PAYMENT OF LIABILITIES.** Immediately after giving effect to the consummation of the Transactions, (a) the Seller will be able to pay its Liabilities as they become due in the usual course of its business, and (b) taking into account all pending and threatened litigation, final judgments against the Seller in actions for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, the Seller will be unable to satisfy any such judgment promptly in accordance with its terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of the Seller. The cash available to the Seller, after considering all other anticipated uses of the cash, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

**SECTION 3.15 BROKERAGE FEES.** Seller has retained Generational Equity to solely represent them in this transaction, and will pay any commissions owed to Generational Equity out of the Cash Payment on the Closing Date. No other brokerage commissions or fees are due by Seller or Company.

**SECTION 3.16 CONSENTS AND APPROVALS.** The execution and delivery of this Agreement by Seller does not, and the performance of the Transactions by Seller will not, require any filing with or notification to, or any consent, approval, authorization or permit from, any governmental or regulatory authority or any other Person.

**SECTION 3.17 DISCLOSURE.** The information provided by Seller and Selling Shareholders in connection with this Agreement, including, without limitation, the schedules hereto, and in any other writing pursuant hereto does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances under which they are made, not false or misleading. Copies of all documents heretofore or hereafter delivered or made available by Seller to Company pursuant hereto were or will be complete and accurate records of such documents. Seller has disclosed to Company all facts that are material to the financial condition, operation, or prospects of the Business, and the Assets.

**SECTION 3.18 ACCURACY AND MATERIALITY OF REPRESENTATIONS, WARRANTIES AND COVENANTS.** No representation, warranty or covenant of Seller and Selling Shareholders contained in this Agreement or any other document prepared by Seller and delivered to Company incident to this Agreement contains any untrue statements of a material fact, or fails to state a material fact necessary in order to make the statements made in this Agreement or such document not misleading. Each of the representations, warranties and covenants contained in this Section 3 shall be deemed to be material to and have been relied upon by Company, and shall be binding and enforceable against Seller and Selling Shareholders.

**ARTICLE IV**
**CERTAIN AGREEMENTS AND UNDERSTANDINGS**

**SECTION 4.1 TRANSITION AGREEMENT.** After the Closing Date, Karen Korner will agree to be available to Company for up to 80 hours of transition at no cost over the next 6 months. Company expects that this will largely consist of an initial few days on site in Plantation, Florida and then being available by phone or email as items come up.

**SECTION 4.2 AGREEMENT NOT TO COMPETE.**

(a)     From the Closing Date to the five-year anniversary of the Closing Date, Seller and Selling Shareholders hereby agree (a) that they shall not have any interest in, own, manage, operate, control, be connected with as a shareholder (other than as a shareholder of less than Five Percent (5%) of the issued and outstanding stock of a publicly held corporation), joint venture, or otherwise engage or invest or participate in, any business that competes with the business of the Company as it exists on the Closing Date,  including, but not limited to screen printers, embroiderers, and promotions providers.  This restrictive covenant shall be valid and enforceable throughout the United States.

(b)     From the Closing Date to the five (5) year anniversary of the Closing Date, Seller and Selling Shareholders agree that they will not (i) solicit as an employee or consultant any of the employees of the Company or Seller; and (ii) solicit any clients of the Company or Seller without the prior consent of Company.

(c)     All of the parties agree that the duration and area for which the covenant not to compete set forth is to be effective as reasonable.  In the event that any court determines that the time period or the geographical area provided for in this Section, or both of them, are unreasonable and that such covenant is to that extent unenforceable, such covenant shall remain in full force and effect for the greatest time period and in the greatest geographical area that would not render it unenforceable.

(d)     The parties agree that damages would be an inadequate remedy for Company in the event of a breach or threatened breach of this Agreement and thus, in any such event, Company may, either with or without pursuing any potential damage remedies, immediately obtain and enforce an injunction prohibiting any of the Selling Shareholders from violating this Agreement.

**SECTION 4.3 DELIVERY OF RECORDS AND CONTRACTS; FURTHER ASSURANCES.**

(a)     At the time of the Closing, subject to subsection (c) below, Seller shall deliver or cause to be delivered to Company all of Seller's contracts, commitments, agreements, and rights which are included in the Assets, with such assignments thereof and consents to assignments as are necessary to assure Company of the full benefit of the same. Seller shall also deliver to Company at the time of the Closing copies of all of Seller's business records, books and other data, and Seller shall take all requisite steps to put Company in actual possession and operating control of the Assets.

(b)      Seller and Selling Shareholders from time to time after the Closing agree that they will promptly transfer or deliver to Company any assets, cash or other property that they may discover or receive with respect to any contracts, commitments, sales orders, purchase orders or any other items included in the Assets.

(c)      If an attempted sale, conveyance, assignment, transfer or delivery of any contracts, claims, commitments, franchises, privileges, permits, consents, certificates, licenses or any other assets, rights or benefits to be sold, conveyed, assigned, transferred and delivered to Company which are included in the Assets (collectively, the "Rights") would be ineffective without the consent of any other person, and such consent has not been obtained on or before the Closing Date, this Agreement shall not constitute an assignment or an attempted assignment of such Right if such assignment or attempted assignment would constitute a breach thereof or be unlawful. In such case, Seller shall use commercially reasonable efforts to obtain, as soon as practicable, the consent of each such or other person in all cases in which such consent is required, and Seller and Company will cooperate in any reasonable arrangement designed to enable Seller to perform its obligations hereunder, and to provide for the assumption by Company of the benefits, risks and burdens of, any such agreement consistent with the provisions of this Agreement.

(d)      Seller and Selling Shareholders from time to time after the Closing at the request of Company and without further consideration shall execute and deliver further instruments of transfer and assignment and take such other action as Company may be reasonably required to more effectively transfer and assign to, and vest in, Company each of the Assets.

**SECTION 4.4 CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.**  Seller and Selling Shareholders shall not disclose to any third party any of the terms of this Agreement without the prior written consent of the Company (other than to Seller and Selling Shareholders' attorneys, accountants, lenders, and other advisers who are directly involved in the Transactions), unless required, in the opinion of legal counsel, to be disclosed by law, in which case the parties will discuss the terms of such disclosure prior to its release. Seller and Selling Shareholders shall be responsible for ensuring that its agents and representatives comply with this Section. Seller and Selling Shareholders shall not issue any public announcement, report, statement or press release or otherwise make any public statement regarding this Agreement or the Transactions without the prior written consent of the Company, or as otherwise required by law.

**ARTICLE V**
**SURVIVAL AND INDEMNIFICATION**

**SECTION 5.1 SURVIVAL.**  All representations, warranties, covenants and agreements contained in this Agreement or in any other Transaction Document, shall survive the Closing, but are limited to acts before the sale. The right to indemnification pursuant to this Article V will not be affected by any investigation undertaken or made by Company or any of its directors, officers, employees, consultants, agents, accountants, attorneys or other representatives, Affiliates, successors or assigns prior to the Closing Date.

**SECTION 5.2 INDEMNIFICATION BY SELLER AND SELLING SHAREHOLDERS.** Seller and Selling Shareholders shall, jointly and severally, indemnify and hold harmless Company and each of its directors, officers, employees, attorneys, agents, representatives, successors and assigns (collectively, the "Affiliated Parties") in respect of any and all claims, losses, damages, liabilities, declines in value, penalties,

interest, costs and expenses (including, without limitation, any attorneys', accountants' and consultants' fees and other expenses, including any such expenses incurred in connection with investigating, defending against or settling any such claims) (collectively, "Losses") reasonably incurred by Company or its Affiliated Parties, in connection with, or resulting from, each and all of the following:

(a)     any breach of any representation or warranty made by Seller or Selling Shareholders in this Agreement or pursuant hereto or in any document or instrument delivered by Seller or Selling Shareholders pursuant hereto;

(b)     any misrepresentation contained in any written statement or certificate furnished by Seller or Selling Shareholders pursuant to this Agreement or in connection with the Transactions occurring prior to the closing date;

(c)     any breach of any covenant, agreement or obligation of Seller or Selling Shareholders contained in this Agreement or any other document or instrument contemplated by this Agreement or delivered pursuant hereto;

(d)     any failure by Seller or Selling Shareholders to perform and discharge any of its liabilities incurred prior to the closing date;

(e)     any Liability to any employee, former employee or beneficiary of any of them arising under the provisions of the Consolidated Omnibus Budget Reconsolidation Act of 1985, as amended, with respect to any qualifying event, as defined in Section 4980B of the Code, occurring through the Closing Date;

(f)     any violation of any laws, rules or regulations relating to United States government contracts or subcontracts, including the Federal Acquisition Regulations and related cost accounting standards, including without limitation any such laws or regulations relating to defective pricing; and

(g)     any failure of the Seller or the Selling Shareholders to validly accomplish all action necessary for the Seller's authority to enter into this Agreement and to carry out the Transactions.

**SECTION 5.2 INDEMNIFICATION BY COMPANY:**

Company shall, jointly and severally, indemnify and hold harmless Sellers  officers, employees, attorneys, agents, representatives, successors and assigns (collectively, the "Affiliated Parties") in respect of any and all claims, losses, damages, liabilities, declines in value, penalties, interest, costs and expenses (including, without limitation, any attorneys', accountants' and consultants' fees and other expenses, including any such expenses incurred in connection with investigating, defending against or settling any such claims) (collectively, "Losses") reasonably incurred by Seller or its Affiliated Parties, in connection with, or resulting from, each and all of the following:

(a)     any breach of any representation or warranty made by Company in this Agreement or pursuant hereto or in any document or instrument delivered by Company pursuant hereto;

(b)     any misrepresentation contained in any written statement or certificate furnished by the Company pursuant to this Agreement or in connection with the Transactions;

(c)       any breach of any covenant, agreement or obligation of Company contained in this Agreement or any other document or instrument contemplated by this Agreement or delivered pursuant hereto;

(d)       any failure by Company to perform and discharge any of the Assumed Liabilities

(e)       any Liability to any employee, former employee or beneficiary of any of them arising under the provisions of the Consolidated Omnibus Budget Reconsolidation Act of 1985, as amended, with respect to any qualifying event, as defined in Section 4980B of the Code, occurring after the Closing Date;

**SECTION 5.3 CLAIMS FOR MUTUAL INDEMNIFICATION.** Whenever any claim shall arise for indemnification hereunder, the Indemnified Party Company or Seller shall promptly notify the Indemnifying Party Company or Seller to provide indemnification of the claim and, when known, the facts constituting the basis for such claim; provided, however, that the failure to so notify the Indemnifying Parties shall not relieve the Indemnifying Parties of their obligation hereunder to the extent such failure does not prejudice the Indemnifying Parties. In the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, the notice to the Indemnifying Parties shall specify, if known, the amount or an estimate of the amount of the liability arising there from (the "Indemnified Amount").Company shall be entitled to offset the Indemnified Amount against any payments which may be due and owing to the Indemnifying Parties.

**SECTION 5.4 INTEREST.**  Any amount of money owed by Indemnifying Parties to the Indemnified Party hereunder shall be paid with statutory interest from the date that the loss or damage was sustained or cash disbursement made by the Company until such amount is paid by the Indemnifying Parties.

**ARTICLE VI**
**MISCELLANEOUS**

**SECTION 6.1 FEES AND EXPENSES.**    Seller and Selling Shareholders, on the one hand, and Company, on the other hand, will bear their own expenses in connection with the negotiation and the consummation of the Transactions, including, without limitation, any broker's commission or finder's fee incurred by such party.

**SECTION 6.2 GOVERNING LAW.**  This Agreement shall be governed by, and construed and enforced in accordance with, the internal law, and not the law pertaining to conflicts or choice of law, of the state of Florida.  Venue and jurisdiction for any dispute hereunder shall be proper only in Broward County, Florida.

**SECTION 6.3 COUNTERPARTS.**  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**SECTION 6.4 COMPLETE AGREEMENT.**  This Agreement, the Exhibits and Schedules and the documents delivered or to be delivered pursuant to this Agreement, and any other agreements or documents executed by the parties concurrent herewith, contain or will contain the entire agreement among the parties with respect to the Transactions and shall supersede all previous oral and written and all contemporaneous oral negotiations, commitments and understandings.

**SECTION 6.5 MODIFICATIONS, AMENDMENTS AND WAIVERS.**  This Agreement may be modified, amended or otherwise supplemented only by a writing signed by all of the parties. No waiver of any right or power hereunder shall be deemed effective unless and until a writing waiving such right or power is executed by the party waiving such right or power.

**SECTION 6.6 FURTHER ASSURANCES.**  Each party shall execute and deliver such further instruments and take such further actions as any other party may reasonably request in order to carry out the intent of this Agreement and to consummate the Transactions.

**SECTION 6.7 CONTRACT INTERPRETATION; CONSTRUCTION OF AGREEMENT.**

(a)    The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Article, section, exhibit, schedule, preamble, recital and party references are to this Agreement unless otherwise stated.

(b)    No party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions of this Agreement, and all language in all parts of this Agreement shall be construed in accordance with its fair meaning, and not strictly for or against any party.

**SECTION 6.8 SEVERABILITY.**  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all other terms and provisions of this Agreement will nevertheless remain in full force and effect. Upon any such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in any acceptable manner to the end that the sale of the Assets is consummated to the extent possible.

\*    \*    \*

IN WITNESS WHEREOF, each of the parties has executed this Agreement as of the date first above written.

**JAL EQUITY CORP:**

By: _____  Date: 11/30/2021
Eran Salu, Managing Director

**DIRECTIONAL ADVERTISING SOLUTIONS, INC. d/b/a DAS GROUP**

By: _____  Date: 11-30-2021
Karen Korner, Owner

By: _____  Date: 11-30-2021
Christina Parsons, Owner

**KAREN KORNER, AN INDIVIDUAL**

_____  Date: 11-30-2021
Karen Korner

**CHRISTINA PARSONS, AN INDIVIDUAL**

_____  Date: 11-30-2021
Christina Parsons

**LIST OF EXHIBITS**

Exhibit A                    Employment Agreement

**LIST OF SCHEDULES**

Schedule 2.1(a)          Equipment
Schedule 2.1(b)          Accounts Receivable
Schedule 2.1(c)          Customer Contracts
Schedule 2.1(d)          Intellectual Property
Schedule 2.1(e)          Prepaid Expenses
Schedule 2.2(b)          Excluded Accounts Receivable
Schedule 2.3(a)          Accounts Payables
Schedule 2.3(b)          Accrued Liabilities
Schedule 2.3(c)          Deferred Revenues
Schedule 2.3(d)          Business Debt
Schedule 2.4             Assumed Contracts
Schedule 2.7             Allocation Schedule
Schedule 3.5             Business Information
Schedule 3.8(e)          Seller Software
Schedule 3.8(g)          Seller Contact Info
Schedule 3.10            Employment Matters

# EX. "B"

FlexiCapture Cover Sheet

Exit Planning Agreement

NOT AN OFFICIAL COPY – ATTORNEY – NOT AN OFFICIAL COPY



### EXIT PLANNING AGREEMENT

This Exit Planning Agreement ("EPA") is between Generational Equity, LLC ("GE") and the undersigned entity (the "Company" and, together with its Owners, "Client"). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Nondisclosure Agreement between GE and Client (the "NDA"), which is incorporated herein by reference.

**Five Year Commitment**. This EPA will be effective for 5 years from its Effective Date (the "Term"). Under this EPA, GE agrees to provide the following exit planning services (the "Exit Planning Services") and deliver the following documents (the "Documents") to Client:

(a)   The **Evaluation Report**, which will recast the Company's financial statements and history, and provide pro forma projections utilizing public and private company data to provide an estimate of the enterprise value of the Company;

(b)   The **Roadmap to Enhanced Value**, which will analyze the Company from the perspective of a potential buyer to highlight potential areas of performance improvement; and

(c)   The **Confidential Information Memorandum**, which is a marketing document that will provide prospective buyers with a comprehensive overview of the Company (without an estimate of value).

GE will use its best efforts to deliver the Documents within 90 days from the time GE receives all necessary Company information. Client may, upon request, have the Documents updated up to 2 times during the Term of this EPA at no additional cost. This is not an agreement to sell the Company. Client may subsequently engage a Generational Group member to provide M&A and other relevant services (collectively, "Additional Services") under one or more separate agreements (as described on Schedule 1 of this EPA, which is incorporated in this EPA and any subsequent agreements between the parties).

**Accuracy of Information**. Client is solely responsible for providing complete and accurate information about the Company to GE, and GE shall not be responsible for any inaccuracies in the Documents that result from Client's failure to supply GE with complete and accurate information. Client agrees to indemnify and hold harmless GE, its officers, directors, employees, agents, representatives, and affiliates against any loss, damage, liability, claim, expense (including attorneys' fees), or disputes arising out of: (a) information provided by Client; (b) any incomplete, false, or misleading written or oral information or representations made by Client; (c) Client's breach of this EPA or any other agreement between Client and a Generational Group member; and (d) claims made by Owners of the Company. The provisions of this paragraph shall survive expiration or termination of this EPA and shall be binding upon the successors and assigns of the Company.

**Exit Planning Fee**. Client agrees to pay GE a one-time fee in the amount of $44,500 USD for Exit Planning Services (the "Exit Planning Fee"). The Exit Planning Fee is non-refundable.

**Resolution Process**. The parties agree that any dispute relating to this EPA shall be subject to binding arbitration under the Federal Arbitration Act, administered under the applicable rules of the American Arbitration Association (AAA). The parties agree not to initiate any complaint, review, blog post, claim, or accusation(s) in any format whatsoever, including verbally and online, without first complying with the requirements of this paragraph. No party shall join or consolidate disputes by or against others in any arbitration or include in arbitration any disputes with respect to which any party is a representative or member of a class. The provisions of this paragraph shall survive expiration or termination of this EPA and shall be binding upon the successors and assigns of the Company.

**Entire Agreement**. This EPA, including Schedule 1, the NDA, and any subsequent agreement between the parties (if any) constitute the sole and entire agreement of the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, written or oral. This EPA shall take effect upon GE's acceptance at its headquarters in Dallas, Texas (the "Effective Date"). This EPA shall bind and inure to the benefit of the Company, its affiliates, and its owner(s) (collectively, "Owner"), and all Generational Group members, successors, and assigns. Client acknowledges that any statements made by any Generational Group member regarding the value of the Company are not a guarantee or warranty, are non-binding, and shall not be relied upon. This EPA may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. GE shall have the right to assign this EPA to Generational Capital Markets, Inc. This EPA may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. Signatures may be made and exchanged electronically, and electronic signatures will be effective for all purposes.

**FOR CLIENT:**   Company Name: DAS GROUP, INC.    Signature X _Kar Kon_

   Owner Name(s): KAREN KORNER    Date: 9/30/20

**FOR GE:**   Signature: _R Dean_    Date: 9/30/20

GG v.3. 9.10.19 – Doc 19

# FlexiCapture Cover Sheet

Nondisclosure Agreement



### Nondisclosure Agreement

This Nondisclosure Agreement (this "NDA") is executed on ___SEP 30TH___, 20**20** (the "Effective Date"), between Generational Equity, LLC ("GE"), on behalf of itself, Generational Capital Markets, Inc., and Generational Capital Canada, Inc. (together, with GE, "Generational Group"); and the undersigned entity (the "Company"), for the benefit of Client (defined below).

**Confidential Information.** To further informed and candid discussions regarding Client's exit planning goals, Client may provide or disclose to Generational Group certain non-public, confidential, or proprietary information about Client, including, but not limited to, the identity of Owners (defined below), trade secrets, customer and vendor lists, and financial information (collectively, the "Confidential Information"). Confidential Information does not include information that: (a) at the time of disclosure is, or thereafter becomes, generally available to the public, other than as a result of any material breach of this NDA by Generational Group; (b) at the time of disclosure is, or thereafter becomes, available to Generational Group from a third-party source who, to Generational Group's knowledge, is not subject to similar confidentiality obligations; (c) was known by or in possession of Generational Group prior to being disclosed by Client; (d) was independently developed by Generational Group without reference to or use of the Confidential Information; or (e) Generational Group is required to disclose by law or governmental order.

**Confidentiality Obligation.** Generational Group agrees that it will use commercially reasonable standards to hold the Confidential Information in strict confidence, and will not, without the Company's prior consent, communicate the Confidential Information to any person or entity other than Generational Group's employees, contractors, agents, and representatives who need to know such Confidential Information in order to perform services for or on behalf of Client. This NDA will automatically terminate upon completion or termination of all services to be performed for the Company by any Generational Group member, but the confidentiality obligations herein shall continue for 2 years after termination. Upon termination of this NDA, Generational Group will, upon written request from the Company, promptly destroy all Confidential Information in its possession, except information Generational Group is obligated to retain for legal or regulatory purposes, or under Generational Group's internal record retention policies.

**Governing Law; Venue.** This NDA shall be interpreted, enforced under, and governed by the laws of the state of Texas, without regard to any conflicts of law principles. The parties hereby agree that venue and jurisdiction of any legal action (including arbitration) concerning this NDA or any other agreement between Client and any Generational Group member shall be located exclusively in Dallas County, Texas.

**Relationship.** Nothing in this NDA shall obligate any party to enter into any additional agreements or to form any additional business relationships. Client acknowledges that Generational Group will not provide any estimates of value for the Company, and that any oral discussions regarding value shall not be relied upon for any purpose.

**Authority.** The representative of the Company signing this NDA represents that they have full legal authority to execute this NDA on behalf of the Company.

**Entire Agreement; Amendments.** This NDA contains the full and complete understanding of the parties and supersedes all prior written or oral statements or representations with respect to the subject matter hereof, may be incorporated by reference into subsequent agreements, and shall inure to the benefit of affiliates and direct and indirect equity owners of the Company (collectively "Owners" and together with the Company, "Client"). This NDA may not be amended except in writing signed by a Generational Group member and the Company. This NDA may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. Signatures may be made and exchanged electronically, and electronic signatures or electronic copies of signatures will be effective for all purposes.

| FOR COMPANY: | FOR GENERATIONAL GROUP: |
|---|---|
| By: X _Karen Korner_ | |
| Company: DAS GROUP, INC. | By: _Roger Dean_ |
| Name: KAREN KORNER | Name: ROGER DEAN |
| Title: SEC/TREAS. | Title: SR MGNG DIR |

Genera... ...nal Group, LLC  2019 OC ...1  ...  ..9A

FlexiCapture Cover Sheet

Schedule I Agreement

 **GENERATIONAL**

<u>SCHEDULE 1</u>
ADDITIONAL SERVICES

## M&A Services

**Services**. At no additional cost, Client may engage Generational Group to provide M&A Services under a separate agreement, which will incorporate this Schedule 1. M&A Services include: (a) identifying, contacting, and coordinating prospective Buyers for the Company and introducing Buyers to Client; (b) furnishing materials describing the Company's operations and tangible and intangible assets to Buyers; (c) assisting Client in understanding Buyer's perspective of the transaction; (d) assisting with negotiation of a Sale, and advising on the transaction documents from a business and M&A perspective; and (e) providing assistance with the due diligence and closing process (collectively, the "M&A Services"). The M&A Services will be provided for a term of thirty-six months, with the option to terminate after the initial twelve months. Generational Group members do not provide legal, tax, accounting, or environmental advice or services, and Client agrees that it will not rely on any statements regarding these matters. If Client desires to procure any legal, tax, accounting, or environmental advice or services, it may do so at its sole cost and expense.

**Costs and Expenses**. Unless otherwise agreed in writing, Client will not be responsible for any of the administrative, data room, marketing, airfare, lodging, other travel, or any other expenses incurred by Generational Group in providing the M&A Services.

**Sale**. With respect to the M&A Services, the term "Sale" means and includes a merger, consolidation, recapitalization, corporate restructuring, or other business combination of the Company, and/or a transfer of all or any portion of the assets or ownership of the Company to any person or entity, including, but not limited to, the Owners or members of their immediate families, affiliates of Owners, employees and affiliates of employees, and ESOPs or similar entities (collectively, "Buyers").

**Consideration**. In the event Client engages any Generational Group member to provide M&A Services, Client agrees to pay a fee to such Generational Group member upon the Sale of the Company (the "Success Fee"). The Success Fee is based upon the total consideration received or to be received directly or indirectly by Client or its affiliates, subsidiaries, or related entities as a result of the Sale, including, but not limited to: cash, cash equivalents, stock or other securities of the Buyer or a related operating entity, publicly traded stock or other securities, notes payable to Client or its successor beneficiaries, accounts receivable, liabilities or debt assumed by the Buyer, operating assets retained by Client or an affiliated entity (including, but not limited to, accounts receivable, inventory, and fixed assets), total future payments under consulting and employment agreements, royalties, intellectual property sold or licensed, total future payments to Client or any related company under real property leases, real property sold, earnouts (consideration paid to Client which is based on the financial performance of the Company after the Sale), and (collectively, the "Consideration"). Consideration will be applied to the Success Fee calculation in the order it is listed above. Consideration does not include ownership interests retained by an Owner or by a new entity formed for the sole purpose of the Sale, unless any such ownership interests are included in a subsequent Sale occurring within twenty-four months after the initial Sale.

**Calculation and Payment of the Success Fee**. The Success Fee will be calculated prior to the Sale and shall be paid simultaneously with the closing of the Sale, except that the portion of the Success Fee attributable to earnout payment(s) shall be paid as and when Client receives such earnout payment(s). For clarity, the Success Fee is calculated based upon the total Consideration, and there shall be no discount based on the amount of accounts receivable conveyed with the Company to the Buyer at the closing of the Sale. The Success Fee is subject to a minimum of $100,000 USD, minus the Exit Planning Fee.

**Success Fee**. The Success Fee will be calculated in accordance with the following schedule:

> 10% of any amount up to $1 million; plus
> 8% of any amount between $1 million and $2 million; plus
> 6% of any amount between $2 million and $3 million; plus
> 4% of any amount between $3 million and $4 million; plus
> 2% of any amount above $4 million;
> **less the Exit Planning Fee previously paid by Client.**

**Offers**. Client shall have the sole and absolute right to accept or reject any offer received from a Buyer, and a Generational Group member will not enter into any agreement concerning a Sale without Client's prior consent.

## Other Services

Any Owner may engage any Generational Group member to provide other services, including Wealth Management Services, under a separate agreement. Wealth Management Services are not included in M&A Services. Wealth Management Services include, but are not limited to: (a) comprehensive financial planning, including initial and ongoing financial planning; (b) portfolio management based on the Owner's goals and risk tolerance; and (c) support with operational paperwork.

Client Acknowledgement of Receipt: (X)Initials: _____

GG v.3. 9.10.19 – ST-Sched

# IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
# IN AND FOR BROWARD COUNTY, FLORIDA

DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a DAS GROUP
a Florida corporation

      Plaintiff,                             CASE NO. CACE 24-001876

           vs.

JAL EQUITY CORP, a Nevada
Corporation, and ERAN SALU,
Individually,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on:

**JAL EQUITY CORP, a Nevada Corporation**

**Registered Agent: INCORP SERVICES, INC.**
**Karla Vazquez, President**
**3773 Howard Hughes Pwky, Ste 500S**
**Las Vegas, NV 89169-6014**

DATED on _____ FEB 13 2024 _____

Brenda D. Forman

As Clerk of the Court

By _____

As Deputy Clerk   BRENDA D. FORMAN

ATTORNEY – NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY

<u>IMPORTANT</u>

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

Case 0:24-cv-60450-MD Document 1-1 Entered on FLSD Docket 03/21/2024 Page 37 of 53
CACE-24-001876

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a DAS GROUP
a Florida corporation

      Plaintiff,                         CASE NO. CACE 24-001876

                vs.

JAL EQUITY CORP, a Nevada
Corporation, and ERAN SALU,
Individually,

      Defendants.

_____/

<u>**SUMMONS**</u>

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on:

**ERAN SALU
2895 Dick Wilson Dr.
Sarasota, FL 34240**

DATED on      FEB 13 2024              Brenda D. Forman

                                    As Clerk of the Court

                                    By _____

                                    As Deputy Clerk   **BRENDA D. FORMAN**

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

# RETURN OF NON-SERVICE

| | | |
|---|---|---|
| **State of Florida** | **County of Broward** | **Circuit Court** |

Case Number: CACE 24-001876

Plaintiff:
**DIRECTIONAL ADVERTISING SOLUTIONS, INC., D/B/A DAS GROUP A FLORIDA CORPORATION**

vs.

Defendant:
**JAL EQUITY CORP, A NEVADA CORPORATION, AND ERAN SALU, INDIVIDUALLY,**

For:
ALEXANDRA SIERRA DE VARONA
DE VARONA LAW
4800 N. FEDERAL HWY
SUITE 104D
BOCA RATON, FL 33431

CPN2024006130

Received by Caplan, Caplan & Caplan Process Servers on the 13th day of February, 2024 at 1:22 pm to be served on **ERAN SALU, 2895 DICK WILSON DR., SARASOTA, FL 34240**.

I, Steven T. Zawacki, do hereby affirm that on the **16th day of February, 2024** at **12:00 pm, I:**

**NON-SERVED** the **SUMMONS, COMPLAINT AND EXHIBITS** for the reason that I failed to find **ERAN SALU** or any information to allow further search.  Read the comments below for further details.

**Additional Information pertaining to this Service:**
2/13/2024  6:23 pm  Attempted service at 2895 DICK WILSON DR., SARASOTA, FL 34240 no answer. No cars. House is pitch dark.

I am over the age of 18 and have no interest in the above action. I am certified in good standing in the judicial circuit in which the process was served.  No notary required pursuant to FS92.525.2 and under penalty of perjury, I declare that the facts set forth are true and correct.

Steven T. Zawacki
#283

**Caplan, Caplan & Caplan Process Servers**
14160 Palmetto Frontage Rd
Suite 105
Miami Lakes, FL 33016
(305) 374-3426

Our Job Serial Number: CPN-2024006130

Copyright © 1992-2024 DreamBuilt Software, Inc. - Process Server's Toolbox V8.2w

Filing # 191742093 E-Filed 02/12/2024 11:53:16 AM

CACE-24-001876

## IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a DAS GROUP
a Florida corporation

     Plaintiff,

               vs.

JAL EQUITY CORP, a Nevada
Corporation, and ERAN SALU,
Individually,

     Defendants.

_____/

CASE NO. CACE 24-001876

Served Date _____
Served Time _____
Server _____ I.D.# _____

### SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on:

**ERAN SALU**
**2895 Dick Wilson Dr.**
**Sarasota, FL 34240**

DATED on _____ FEB 13 2024 _____

Brenda D. Forman

As Clerk of the Court

By _____

As Deputy Clerk **BRENDA D. FORMAN**

## IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a DAS GROUP
a Florida corporation

       Plaintiff,                         CASE NO. CACE 24-001876

               vs.

JAL EQUITY CORP, a Nevada
Corporation, and ERAN SALU,
Individually,

       Defendants.

_____/

## ALIAS SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this alias summons and a copy of the complaint in this lawsuit
on:

**ERAN SALU**
c/o Marketing.com
101 Workman Court
Eureka, MO 63025

DATED    __FEB 26 2024__

                              Brenda D. Forman

                              As Clerk of the Court

By _____

    As Deputy Clerk

BRENDA D. FORMAN

ATTORNEY – NOT AN OFFICIAL COPY    NOT AN OFFICIAL COPY

IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

## AFFIDAVIT OF SERVICE

| State of Florida | County of Broward | Circuit Court |
| --- | --- | --- |

Case Number: CACE 24-001876

Plaintiff: **DIRECTIONAL ADVERTISING SOLUTIONS, INC., D/B/A DAS GROUP A FLORIDA CORPORATION**
vs.
Defendant: **JAL EQUITY CORP, A NEVADA CORPORATION, AND ERAN SALU, INDIVIDUALLY,**

For: ALEXANDRA SIERRA DE VARONA
    DE VARONA LAW

Received by Caplan, Caplan & Caplan Process Servers on the 13th day of February, 2024 at 1:11 pm to be served on **JAL EQUITY CORP, A NEVADA CORPORATION C/O INCORP SERVICE, INC. AS REGISTERED AGENT, C/O KARLA VAZQUEZ AS PRESIDENT, 3773 HOWARD HUGHES PKWY, STE 500S, LAS VEGAS, NV 89169.** I, Donald Taylor, being duly sworn, depose and say that on the **20 day of February, 2024 at 10:18 a.m.**, executed service by delivering a true copy of the **SUMMONS, COMPLAINT AND EXHIBITS** in accordance with state statutes in the manner marked below:

( )PUBLIC AGENCY:By serving_____as_____Served the named agency by delivering a true copy of pleadings and informed said person of the contents therein, with date,hour,initials of service endorsed thereon by me in compliance with State Statute
( )CORPORATE SERVICE/CORPORATE LLC:By serving _____ as _____. Served the named person by delivering a true copy of pleadings and informed said person of the contents therein,with the date, hour and initials of service endorsed thereon by me in compliance with State Statute
( )CORPORATE REGISTERED AGENT:By serving_____ as Registered Agent. Served the named person by delivering a true copy of pleadings and informed said person of the contents therein,with date,hour,initials of service endorsed by me in compliance with State Statute
( X)CORPORATE REGISTERED AGENT EMPLOYEE:By serving **Yamin Caballero** as Employee of Registered agent. Served the named person by delivering a true copy of pleadings and informed person of the contents therein,with date,hour,initials of service endorsed thereon by me in compliance with F.S.48.081(3)(a) and 48.091, the registered agent failed to comply by not being available for service between the hours of 10am and 12pm
( )CORPORATE SUBSTITUTE RESIDENTIAL :By serving_____as _____Served the named person at a residence by delivering true copy of pleadings and informed person of the contents therein,with the date,hour and initials of service endorsed thereon by me in compliance with F.S. 48.081(3)(b) and 48.031(1)(a) as the registered agent failed to comply by not being available for service between10am and 12pm
( )SERVED:Served a Authorized person by delivering a true copy with date and hour of service endorsed to _____as_____ who stated they are authorize to accept service for deponent and informed said person of the contents
( )NO SERVICE:Reason stated in comments

**COMMENTS:** _____

_____

_____



## AFFIDAVIT OF SERVICE For CACE 24-001876

Under penalties of perjury, I declare that I have read the foregoing Affidavit of Service / Return of Service and that the facts stated in it are true. I certify that I have no interest in the above action, am of legal age and service was made within this state by an officer authorized to serve process where the person was served.

Subscribed and Sworn to before me on the 4
day of March , 2024 by the affiant who
is personally known to me.

_____
NOTARY PUBLIC

SAMANTHA LYNN FARMER
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 20-5532-02 - Expires March 9, 2024

PROCESS SERVER # **R-2022-13398**
Appointed in accordance with State Statutes

**Caplan, Caplan & Caplan Process Servers**
**351 SW 136th Avenue**
**Suite 207**
**Davie, FL 33325**
**(305) 374-3426**

Our Job Serial Number: 2024006136

Filing # 191742093 E-Filed 02/12/2024 11:53:16 AM                    CACE-24-001876

## IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a DAS GROUP
a Florida corporation

        Plaintiff,                    CASE NO. CACE 24-001876

           vs.

JAL EQUITY CORP, a Nevada
Corporation, and ERAN SALU,
Individually,

        Defendants.

_____/

*2/20/24*
*10:18 Am*
*D.T*
*R-2022-13398*

### SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on:

**JAL EQUITY CORP, a Nevada Corporation**

**Registered Agent: INCORP SERVICES, INC.**
**Karla Vazquez, President**
**3773 Howard Hughes Pkwy, Ste 500S**
**Las Vegas, NV 89169-6014**

DATED on _____ FEB 13 2024

                      Brenda D. Forman

                      As Clerk of the Court

                      By _____

                      As Deputy Clerk **BRENDA D. FORMAN**

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

### IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

ALEXANDRA SIERRA-DE VARONA, ESQ.
DE VARONA LAW
4800 N. Federal Highway, Suite D-104
Boca Raton, Florida 33431

Case 0:24-cv-60450-MD   Document 1-1   Entered on FLSD Docket 03/21/2024   Page 50 of 53

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO: CACE 24-001876

DIRECTIONAL ADVERTISING SOLUTIONS,
INC., d/b/a DAS GROUP a Florida corporation

      Plaintiff,

v.

JAL EQUITY CORP, a Nevada corporation,
and ERAN SALU, Individually,

      Defendants.

_____/

**UNOPPOSED MOTION FOR EXTENSION OF TIME FOR DEFENDANT,
JAL EQUITY CORP, TO RESPOND TO PLAINTIFF'S COMPLAINT**

      Defendant, JAL EQUITY CORP, by and through undersigned counsel, respectfully requests an extension of time to respond to Plaintiff, Directional Advertising Solutions Inc.'s, Complaint, and in support states as follows:

1. On March 8, 2024, counsel for Defendant JAL Equity Corp were retained in this case. At that time, counsel for Plaintiff confirmed it had no objection to an extension of time up to and including March 25, 2024, for Defendant JAL Equity Corp to respond to the Complaint.

2. Therefore, Defendant JAL Equity Corp requests an extension of time, up to and including March 25, 2024, to respond to the Complaint.

3. Plaintiff does not object to the requested extension of time.

4. This request is not being made for the purpose of delay, and the extension will not prejudice the parties as they both agree to the extension.

WHEREFORE, Defendant JAL Equity Corp respectfully requests an extension of time, up through and including March 25, 2024, to respond to the Complaint.

Dated: March 11, 2024        Respectfully submitted,

PAG Law, PLLC
Attorneys for Defendant JAL Equity Corp.
By: /s/ Daniel C. Mazanec
     Daniel C. Mazanec
     Florida Bar No. 88737
     Kristy Rich
     Florida Bar No.1050752
     1441 Brickell Avenue, Suite 1120
     Miami, Florida 33131
     Tel. 786.292.1599 | Fax 786.373.7122
     dan@pag.law
     kristy@pag.law

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served on this 11th day of March, 2024, with the Clerk of the Court via the Florida ePortal system to all counsel and parties of record.

/s/ Daniel C. Mazanec

Case 0:24-cv-60450-MD Document 1-1 Entered on FLSD Docket 03/21/2024 Page 52 of 53

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR BROWARD
COUNTY, FLORIDA

CASE NO: CACE 24-001876

DIRECTIONAL ADVERTISING SOLUTIONS, INC.,
d/b/a DAS GROUP a Florida corporation

      Plaintiff,

v.

JAL EQUITY CORP, a Nevada corporation,
and ERAN SALU, Individually,

      Defendants.

_____/

**AGREED ORDER ON MOTION FOR EXTENSION OF TIME FOR
DEFENDANT, JAL EQUITY CORP, TO RESPOND TO PLAINTIFF'S COMPLAINT**

THIS CAUSE, having come before the Court on Defendant, JAL EQUITY CORP's, Unopposed

Motion For Extension of Time For Defendant, JAL Equity Corp, To Respond To Plaintiff's Complaint

(E-Portal filing #193747554). The parties have reviewed the Agreed Order and have no objection to the

entry of the Order.

THE COURT having reviewed the Motion, being advised of an agreement between Plaintiff and

Defendant, JAL Equity Corp, and being otherwise fully advised in the premises, it is hereby ORDERED

AND ADJUDGED, as follows:

1. Defendant's Unopposed Motion For Extension of Time For Defendant, JAL Equity Corp, To

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 03/14/2024 08:39:43 AM.****

Respond To Plaintiff's Complaint (E-Portal filing #193747554) is GRANTED.

    2. Defendant JAL Equity Corp has until March 25, 2024, to respond to the Complaint.

    **DONE AND ORDERED,** <u>14th day of March, 2024</u> , in Chambers in Broward County, Florida.

<u>CACE24001876 03-14-2024 8:32 AM</u>

                _____
                HON. DANIEL A. CASEY
                CIRCUIT JUDGE

**Copies Furnished To:**
Alexandra M Sierra De Varona , E-mail : office@devaronalaw.com
Alexandra M Sierra De Varona , E-mail : frontdesk@devaronalaw.com
Alexandra M Sierra De Varona , E-mail : asd@devaronalaw.com
Daniel C. Mazanec , E-mail : dan@pag.law
Joel Ledezma , E-mail : jledezma@devaronalaw.com
Kristy Rich , E-mail : kristy@pag.law