## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-60450-CIV-DAMIAN/Valle

**DIRECTIONAL ADVERTISING
SOLUTIONS, INC., d/b/a
DAS GROUP,** *et al.,*

> Plaintiffs,

v.

**JAL EQUITY CORP,
a Nevada Corporation,** *et al.*,

> Defendants.

_____/

## ORDER ON MOTION TO DISMISS
## COUNTS II–VI OF FIRSTAMENDED COMPLAINT [ECF NO. 18]

**THIS CAUSE** is before the Court on Defendants, JAL Equity Corp. ("JAL") and

Eran Salu's ("Salu") (collectively, "Defendants"), Motion to Dismiss Counts II–VI of

Plaintiffs' First Amended Complaint [ECF No. 18 (the "Motion" or "Motion to Dismiss")],

filed May 29, 2024.

THE COURT has considered the Motion, the Response [ECF No. 21 (the

"Response")] and Reply [ECF No. 22 (the "Reply")] thereto, the pertinent portions of the

record, and the relevant authorities and is otherwise fully advised. For the reasons that follow,

the Motion is granted in part and denied in part.

### I.      RELEVANT BACKGROUND

The Court accepts the well-pleaded facts in the Amended Complaint as true for

purposes of considering the Motion to Dismiss. *See Hishon v. King & Spalding*, 467 U.S. 69, 73

(1984).

**A.      The Parties And Their Negotiations.**

As alleged in the Amended Complaint, Plaintiff, Directional Advertising Solutions, Inc., d/b/a DAS Group ("DAS"), is a digital marketing firm specializing in local and national digital marketing programs for franchise and corporate entities. Amended Complaint [ECF No. 16] ¶ 9.[1] DAS was founded by co-Plaintiff, Karen Korner ("Korner"), who, at the time of the events at issue here, served as the Secretary, Treasurer, and fifty percent owner of DAS. *See id.* ¶¶ 10–11. Korner jointly owned DAS with non-party Christina Parsons ("Parsons"), who owned the other fifty percent of the firm. *Id.* ¶ 10.

In early 2020, Korner decided to retire and, together with Parsons, chose to sell DAS. *Id.* ¶ 12. As a result, on or about September 30, 2020, DAS engaged a broker to assist with the sale of the firm and entered into an agreement with the broker that provided that the broker would receive a fee from DAS based upon the total consideration resulting from the sale of DAS. *Id.* ¶ 13. Approximately a year later, JAL, through its managing director and president, Salu, worked with the broker to purchase DAS. *Id.* ¶ 14. According to the Amended Complaint, JAL is involved in a traditional printing business and is in the business of mergers and acquisitions, having experience in acquiring companies like DAS. *Id.* ¶ 15, 19.

During an in-person meeting on August 30, 2021, Salu communicated to Korner that he had experience with mergers and acquisitions, and Korner told Salu that she was retiring. *Id.* ¶ 18. During that meeting, when Korner informed Salu that DAS's updated financials were not all available, Salu stated that he was not concerned with the financials because he was interested in purchasing Parsons's talent. *Id.* 19. Salu assured Korner and Parsons that he

---

[1] Throughout this Order, the Court cites the pagination generated by the Court's electronic CM/ECF database, which appears in the headers of all court filings.

would continue to manage DAS and maintain its status as a reliable digital marketing firm. *Id.* At this same meeting, Korner and Parsons explained to Salu that DAS's line of credit for its marketing was established through American Express cards that Korner personally guaranteed. *Id.* ¶ 20. Salu also purportedly expressed to Korner and Parsons that JAL was very successful in marketing with respect to the traditional printing aspect of the business, but that he and, by extension, JAL, needed to venture into the digital arena and sought to acquire DAS to become an all-around marketing leader in the industry. *See id.* ¶ 21.

The parties spoke again by phone in late October 2021. *Id.* ¶ 25. During that call, they discussed the payments related to the sale: a $600,000 immediate payment from JAL to DAS, plus an earn-out of up to $300,000 if certain metrics were reached, as well as an added payment based on a working capital adjustment. *Id.* ¶ 25. Salu then assured Korner and Parsons that the total payout would be approximately between $2,100,000 and $2,300,000. *Id.* ¶ 26.

### B.   *The Agreement.*

Ultimately, the parties entered into an Asset Purchase Agreement ("APA") on November 30, 2021. *Id.* ¶ 28 (citing Ex. A [ECF No. 16 at 17–30]). Many of the Amended Complaint's allegations are premised on specific provisions of the APA. The Amended Complaint cites Section 2.2 of the APA, titled "Excluded Assets," which provides that all amounts in DAS's bank account as of the date of the APA belong to Korner, the seller. *See* Am. Compl. ¶ 36; *see also* ECF No. 16 at 18. The Amended Complaint cites Section 2.3 of the APA, titled "Assumed Liabilities and Business Debt," which provides that JAL would assume and agree to pay all of DAS's trade accounts payable to third parties that remained

unpaid as of the closing date, which included all of the charges accrued by DAS's credit card. Am. Compl. ¶ 38; *see also* ECF No. 16 at 18.

The Amended Complaint also cites Section 2.5 of the APA, which sets out the $600,000 purchase price (to be paid "immediately") and the "Earn-out" amounts, which would be triggered if DAS achieved certain revenues within three years following execution of the APA. Am. Compl. ¶¶ 29–30 (citing ECF No. 16 at 19). And the Amended Complaint cites Section 2.6 of the APA, titled the "Working Capital Adjustment." Am. Compl. ¶ 30 (citing ECF No. 16 at 19–20). According to the "Working Capital Adjustment," an adjustment would be made to the purchase price within ninety (90) days after closing. *Id.* In particular, Section 2.6 states that the purchase price would be increased if the amounts from the "Assumed Liabilities" were less than $1,450,000 and reduced if those same amounts exceeded $1,450,000. *Id.* Similarly, the purchase price would be increased if the amounts from the "Working Capital" were less than $750,000 and would be reduced if the amounts exceeded $750,000.

**C.    *The Parties' Conduct Following Closing.***

On the date the parties signed the APA, November 30, 2021, JAL sent DAS the "immediate" purchase price payment totaling $443,500, which consisted of the initial $600,000 payment less the broker's fee of $156,500. *Id.* ¶ 31. According to the Amended Complaint, Defendants allegedly took it upon themselves to calculate the broker's fee based upon a percentage of the above-mentioned total approximate payout amount of $2,350,000. *Id.* ¶ 32. Plaintiffs also allege that, at the time of closing, DAS was entitled to an increased purchase price pursuant to Section 2.6 of the APA because its "Assumed Liabilities" were

4

less than $1,450,000 and its "Working Capital" was less than $750,000, thus triggering the "Working Capital Adjustment" provision of the APA. *Id.* ¶¶ 34–35.

The Amended Complaint further alleges that the amount of funds available in DAS's accounts at the time of closing totaled approximately $456,118.90. *Id.* ¶ 36. Despite acknowledging that the funds belong to Korner, per Section 2.2 of the APA, JAL and Salu allegedly only reimbursed Korner $300,000, leaving approximately $156.118.90 remaining. *Id.* ¶ 37. And, instead of assuming payment of DAS's vendor accounts pursuant to Section 2.3 of the APA, the Amended Complaint alleges that JAL charged approximately $87,693.23 to DAS's credit cards to pay off a YELP account on or about February of 2022. *Id.* ¶ 39.

###    D.    *The Instant Lawsuit.*

Plaintiffs filed their original complaint[2] in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, on February 9, 2024. *See* ECF No. 1-1 at 5–9. On March 31, 2024, Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 on the basis of diversity jurisdiction. *See generally* ECF No. 1. Shortly thereafter, Defendants filed their first motion to dismiss. [ECF No. 5]. Plaintiffs filed the Amended Complaint, the operative pleading, as a matter of course on May 15, 2024. *See generally* Am. Compl.

In the Amended Complaint, Plaintiffs assert six causes of action: breach of contract against JAL (Count I); breach of fiduciary duty against JAL and Salu (Count II); fraudulent misrepresentation against JAL and Salu (Count III); negligent misrepresentation against JAL

---

[2] The original complaint included claims for breach of contract, fraudulent and negligent misrepresentation, and accounting. *See* ECF No. 1-1 at 10–13.

and Salu (Count IV); unjust enrichment against JAL (Count V); and accounting against JAL (Count VI). *See generally* Am. Compl.

Defendants filed the Motion to Dismiss now before the Court on May 29, 2024 [ECF No. 18], arguing that only the breach of contract claim should survive dismissal because the tort claims are not independent from the breach of contract claim and, thus, fail; the Amended Complaint fails to sufficiently allege facts that demonstrate Defendants owed Plaintiffs a fiduciary duty; the fraudulent and negligent misrepresentation claims fail because the alleged misrepresentations contradict the terms of the APA; the APA precludes a claim for unjust enrichment; and the Amended Complaints fails to state a claim for an accounting. *See generally* Mot.

In their Response, filed June 26, 2024, Plaintiffs maintain that the tort claims are independent from the breach of contract claim; the Amended Complaint's allegations are sufficient to establish that Defendants owed Plaintiffs a fiduciary duty; the alleged misrepresentations explain and are consistent with the APA, rather than contradict it; the existence of the APA is not fatal to the unjust enrichment claim; and the Amended Complaint adequately pleads an accounting claim. *See generally* Resp. [ECF No. 21].

Defendants filed a Reply on July 3, 2024 [ECF No. 22], largely reiterating the arguments set forth in their Motion. The Motion is fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a complaint that does not satisfy the applicable pleading requirements for "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint."

6

*Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002)). The Court must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *Hishon*, 467 U.S. at 73. However, pleadings that "are no more than conclusions[ ] are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Dismissal pursuant to a Rule 12(b)(6) motion is warranted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1310 (11th Cir. 2000) (internal quotation marks omitted) (quoting *Hishon*, 467 U.S. at 73).

Federal Rule of Civil Procedure 8(a)(2) also requires that a pleading contain a "short and plain statement of the claim" showing the pleader is entitled to relief. The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Lastly, Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Rule requires a plaintiff to set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir.1997)).

## III.   DISCUSSION

This Court has undertaken a careful review of the allegations in the Amended Complaint and Defendants' challenges. Defendants seek dismissal of Counts II through VI. Defendants' challenges to Plaintiffs' claims are addressed below.

### A.   *Whether Florida's Independent Tort Doctrine Precludes Plaintiffs' Tort Claims (Counts II–IV).*

Defendants first argue that Counts II through IV, which assert tort claims for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation, are foreclosed by Florida's independent tort doctrine. *See* Mot. at 10–13.

"Under Florida's independent tort doctrine, it is well settled that a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims." *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1353 (S.D. Fla. 2021) (Scola, J.) (citation and quotation marks omitted). The doctrine's impetus stems from "[f]undamental contractual principles . . . [that] bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *Freeman v. Sharpe Res. Corp.*, No. 6:12-cv-1584, 2013 WL 2151723, at *8 (M.D. Fla. May 16, 2013) (citing *Tiara Condo. Association, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408 (Fla. 2013)). It is equally true that "where the alleged tort does not cause harm distinct from that caused by the breach of contract, a plaintiff is barred from bringing a separate tort action." *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV-186-J-34JRK, 2018 WL 905752, at *11 (M.D. Fla. Feb. 15, 2018); *see also Perez v. Scottsdale Ins. Co.*, 19-CV-22346, 2020 WL 607145,

at *2 (S.D. Fla. Feb. 7, 2020) (Gayles, J.) ("[F]or an alleged misrepresentation regarding a contract to be actionable, the damages stemming from that misrepresentation must be independent, separate and distinct from the damages sustained from the contract's breach." (citation omitted)).

To act as a bar to tort claims, "the doctrine requires contractual privity between the parties." *Spears v. SHK Consulting and Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018) (citing *CEMEX*, 2018 WL 905752, at *10); *see also Ultimate Motors, Inc. v. Lionheart Motorcars, LLC*, No. 19-60917-Civ, 2019 WL 9786489, at *2 (S.D. Fla. July 23, 2019) ("[W]here a party is in contractual privity with another, to bring a valid tort claim, the party must establish that the tort is independent of any breach of contact." (citations omitted)).

Here, Defendants contend that Plaintiffs' tort claims fail because they are indistinguishable from the breach of contract claim and because, even if independent from the breach of contract claim, the alleged damages stemming from the tort claims are not distinct from the damages available for the breach of contract claim. *See* Mot. at 11–13.

Plaintiffs first respond that their tort claims against Salu survive dismissal because the independent tort doctrine requires contractual privity between the parties, and, since Salu is not a party to the APA in his individual capacity, there is no contractual privity between him and Plaintiffs. Resp. at 3–4. Plaintiffs also argue that the claims survive the independent tort doctrine because Defendants' alleged breaches of fiduciary duty and misrepresentations are separate from and do not concern the essence of the APA given that the parties' agreement does not contemplate how Defendants were to operate DAS. *See id.* at 6–8. Lastly, Plaintiffs contend that the alleged damages resulting from the tort claims are distinct from the breach of contract damages because, in the tort claims, Plaintiffs allege damages in the form of

Korner's loss of salary and bonuses that she was receiving from DAS prior to entering into the APA and because damages stemming from Defendants' use of Plaintiff's American Express cards and lines of credit are similarly not available based on Defendants' alleged breach of the APA. *Id.* at 8–9.

In their Reply, Defendants address Plaintiffs' response to their secondary argument[3] as to the independent tort doctrine; that is, that the independent tort doctrine bars the tort claims because the damages allegedly stemming from those claims are the same as the damages sought in connection with the alleged breach of contract. *See* Reply at 8–9. In particular, Defendants argue that Plaintiffs did not allege in the Amended Complaint that Korner's lost salary and bonuses constitute damages but, instead, raised those damages for the first time in the Response. *Id.* at 8. Defendants also note that those alleged damages are not plausible because Plaintiffs allege in the Amended Complaint that Korner made the decision to retire, and therefore relinquish her salary and bonuses, before she met Defendants. *Id.* at 8 (citing Am. Compl. ¶ 12). Additionally, according to Defendants, the alleged damages sustained by Plaintiffs as a result of JAL's use of the American Express cards and vendor credit lines are indistinguishable from the damages alleged in the breach of contract claim, as evidenced by the express allegation that JAL breached the APA by, among other things, "using DAS'[s] American Express cards." *Id.* (quoting Am. Compl. ¶ 49).

---

[3] Defendants do not address Plaintiffs' argument in response to the claim that the tort claims are indistinguishable from the breach of contract claim, and, as such, they appear to have abandoned their contention that Plaintiffs' tort claims are barred on these grounds. *See, e.g.*, *W. Flagler Assocs., Ltd. v. City of Miami*, 407 F. Supp. 3d 1291, 1297 (S.D. Fla. 2019) (Scola, J.) ("The [d]efendant abandoned its argument regarding the [p]laintiff's standing because its Reply failed to address any of the plaintiff's arguments or authority.").

Both sides cite *Yuken Corp. v. Gedcore LLC*, No. 22-20661-CIV, 2022 WL 3701233 (S.D. Fla. June 21, 2022) (Altonaga, C.J.). In that case, Chief Judge Altonaga held that, although the plaintiff established that its fraud and breach of contract claims against the defendant company stemmed from separate conduct, the independent tort doctrine nevertheless barred the fraud allegations against the defendant because the plaintiff failed to allege damages separate from its breach of contract claims. *See id.* at *6. As to the finding that the fraud and breach of contract claims stemmed from separate conduct, Chief Judge Altonaga noted that the fulfillment of plaintiff's order of lobster tails from the defendant's company was at the heart of the parties' agreement, but the company's misrepresentation during pre-contract negotiations that it would fulfill the orders from its inventory (when, in fact, it could not) took its conduct beyond the essence of the contract at issue there. *Id.*

Here, Plaintiffs allege in the Amended Complaint that prior to entering into the APA, Salu, on behalf of JAL, misrepresented to Korner and Parsons that (i) Defendants had experience in acquiring companies and making them successful; (ii) JAL was purchasing Parsons's talent and was not concerned with DAS's financials; (iii) DAS was the missing link to propel JAL's traditional print business; (iv) Salu intended to maintain DAS's status as a reliable digital marketing firm; and (v) the payout for the purchase would be approximately between $2,100,000 to $2,300,000. *See* Am. Compl. ¶¶ 18–21, 26. Plaintiffs further allege that Defendants failed to disclose that they have a history of acquiring companies and not paying the full purchase price for their assets and that they had no intention of paying the full purchase price for DAS, maintaining the company, or establishing a new line of credit with vendors. *See id.* ¶¶ 22–23. According to the Amended Complaint, Plaintiffs would not have entered into the APA if not for Salu's omissions. *Id.* ¶ 24.

Like the alleged misrepresentations in *Yuken*, the undersigned finds that Defendants'
representations regarding their intentions with regard to the future of DAS made to Plaintiffs
before entering the APA can be construed as independent from Defendants' performance of
their obligations under the contract. *See* 2022 WL 3701233, at *6; *see also Steel Media Grp., LLC
v. Lewis*, No. 1:22-CV-21780, 2023 WL 1413043, at *6 (S.D. Fla. Jan. 6, 2023) (Damian,
M.J.), *report and recommendation adopted*, No. 1:22-CV-21780-JLK, 2023 WL 1332832 (S.D.
Fla. Jan. 31, 2023). At the heart of the APA was the sale and purchase of DAS, and the
allegations concerning how Defendants would run it or what they intended to do with it once
purchased are not contemplated by the APA. In this regard, the Court agrees with Plaintiffs
that the alleged misrepresentations and omissions were separate from the essence of the
contract.

However, review of the allegations regarding damages reveals that Plaintiffs do not
allege damages in connection with their tort claims that are separate from those in connection
with the breach of contract claim. *See* 2022 WL 3701233, at *6; *see also Steel Media Grp.*, 2023
WL 1413043, at *7. As Defendants point out, although Plaintiffs mention in the Amended
Complaint that Korner gave up her salary and bonuses from DAS, they do not expressly assert
these allegations as a basis for damages. And, in any event, this Court agrees with Defendants
that Plaintiffs cannot plausibly allege that Korner's loss of salary and bonuses constituted
damages stemming from Defendants' pre-contract negotiations because, as alleged in the
Amended Complaint, Korner made the decision to retire before she even met Defendants. *See*
Am. Compl. ¶¶ 12–14. Defendants also correctly aver that the damages allegedly stemming
from Defendants' use of the American Express cards and vendor lines of credit are no different

12

than the damages expressly alleged by Plaintiffs in their breach of contract claim against JAL. *See id.* ¶ 49.

Thus, whereas Plaintiffs identify alleged misrepresentations independent from the heart of the APA, because they fail to allege damages in connection with their tort claims that are distinct from the alleged damages in connection with their contract claim, their tort claims against parties to the APA are barred. The next question is how this conclusion affects the claims in the Amended Complaint.

The independent tort doctrine bars only those tort claims asserted against parties in contractual privity with Plaintiffs. Here, Defendant JAL is a party to the APA, and the breach of contract claim is asserted against JAL only. Plaintiffs do not assert a contract claim against Salu because Salu is not a party to the APA. *See* Am. Compl. ¶¶ 47–50. Thus, Plaintiffs' tort claims against JAL (Counts II-IV) are barred by the independent tort doctrine. Insofar as the tort claims are asserted against Salu, they are not barred because, based on the allegations in the Amended Complaint, there is no contractual privity between Salu individually and Plaintiffs. *See, e.g.*, *BluestarExpo*, 568 F. Supp. 3d at 1354.

For these reasons, insofar as Defendants' Motion to Dismiss argues that the independent tort doctrine bars Plaintiffs' claims for breach of fiduciary (Count II), fraudulent misrepresentation (Count III), and negligent misrepresentation (Count IV), this Court concludes that the Motion is due to be granted in part and those Counts dismissed as to JAL. Further, because these Counts are dismissed as to JAL, to the extent the Court considers the remaining challenges to the tort claims below, it does so only as to Salu.

**B.** **Whether The Amended Complaint Fails To Adequately Plead That Salu Owed**
**Plaintiffs A Fiduciary Duty (Count II).**

Defendants next seek dismissal of the breach of fiduciary duty claim (Count II) on
grounds that the Amended Complaint fails to sufficiently allege facts establishing Salu
consciously accepted any fiduciary obligation to Plaintiffs. *See* Mot. at 13–16.

Under Florida law, "[t]he elements of a cause of action for breach of fiduciary duty
are (1) the existence of a duty, (2) breach of that duty, and (3) damages flowing from the
breach." *Crusselle v. Mong*, 59 So.3d 1178, 1181 (Fla. 5th DCA 2011). A fiduciary relationship
may be implied by law, and such relationships are "premised upon the specific factual
situation surrounding the transaction and the relationship of the parties." *Doe v. Evans*, 814
So. 2d 370, 374 (Fla. 2002). "An implied fiduciary relationship will lie when there is a degree
of dependency on one side and an undertaking on the other side to protect and/or benefit the
dependent party." *Id.* (quoting *Masztal v. City of Miami*, 971 So. 2d 803, 809 (Fla. 3d DCA
2007)); *see also Pastor v. Bank of Am., N.A.*, 664 F. Supp. 3d 1365, 1368 (S.D. Fla. 2023) (Scola,
J.).

A claim for breach of fiduciary duty fails, however, when the transactions at issue
constitute arm's length transactions where no special duty of disclosure exists. *See, e.g.,*
*Watkins v. NCNB Nat. Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) ("In an
arms-length transaction, however, there is no duty imposed on either party to act for the
benefit or protection of the other party, or to disclose facts that the other party could, by its
own diligence have discovered."). The widely understood definition of an arm's length
transaction is one in which the transaction was conducted as though the two parties were
strangers. *See U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*,
583 U.S. 387, 397 (2018) (citing Black's Law Dictionary). Thus, to demonstrate a fiduciary

14

relationship exists, "a plaintiff must plead the existence of something beyond an ordinary commercial relationship." *Scanz Techs., Inc. v. JewMon Enterprises, LLC*, No. 20-22957-CIV, 2021 WL 65466, at *8 (S.D. Fla. Jan. 7, 2021) (Scola, J.). Nevertheless, "the fact that one party places its trust in the other does not create a confidential relationship in the absence of some recognition, acceptance, or undertaking of the duties of a fiduciary on the part of the other party." *Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989).

The issue here boils down to whether Salu's relationship with Plaintiffs was an arm's length transaction—in which case he owed no fiduciary duty to Plaintiffs—or whether there was "a relation of trust and confidence between them; that is, where confidence is reposed by one party and a trust accepted by the other." *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927).

In the Motion to Dismiss, Defendants posit that the Plaintiffs' allegations that they "reposed great trust and confidence in Salu and JAL, to act in [Plaintiffs'] best interest[s] and in good faith" constitute threadbare conclusions that are insufficient to establish that Salu recognized, accepted, or undertook the duties of a fiduciary to Plaintiffs. *See* Mot. at 15–16. It is true that the fact that one party places its trust in the other does not, without more, create a confidential relationship. *See Harris v. Zeuch*, 137 So. 135 (Fla. 1931). But here, Plaintiffs do allege more, including factual allegations explaining how Plaintiffs placed trust and reliance on Salu based on his pre-contract negotiation statements.

Plaintiffs allege that Salu, aware that Korner intended to retire, represented to Plaintiffs that Defendants had experience in acquiring companies and making them successful (Am. Compl. ¶ 18), indicated that JAL was disinterested in DAS's financials and wanted to acquire Parson's talent (*id.* ¶ 19), and communicated that he intended to maintain DAS's status as a reliable digital marketing firm (*id.* ¶ 19). Viewing the allegations in the Amended

Complaint in the light most favorable to Plaintiffs, Plaintiffs sufficiently describe circumstances in which Salu persuaded Plaintiffs to trust that he intended to grow DAS, Korner's retirement plan, into a greater, more profitable success from which Korner could plan to retire comfortably. Although a close call, at this stage in the proceedings, these factual allegations sufficiently demonstrate that Salu invited and fostered Plaintiffs' reliance and established a relationship of trust and confidence. *See, e.g.*, *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 521 (Fla. 3d DCA 1994) (finding special circumstances gave rise to fiduciary duty between bank and customer where, among other things, bank invited customer's reliance by urging them to trust that the bank's plans would benefit customer's business). The Amended Complaint survives the pleading hurdle at this stage. Whether there was a fiduciary duty that was breached is an issue to be determined based on additional facts.

Because the Amended Complaint asserts sufficient factual allegations to establish Salu stepped out of the parties' arm's length transaction and thus owed Plaintiffs a fiduciary duty, the Court denies Defendants' Motion to Dismiss the breach of fiduciary duty claim (Count II) as against Salu.

> **C.    *Whether The Fraudulent And Negligent Misrepresentation Claims Fail As A Matter Of Law (Counts III And IV).***

Defendants argue that the fraudulent and negligent misrepresentation claims fail as a matter of law and warrant dismissal because the alleged misrepresentations contradict the express terms of the APA. Mot. at 16–19. Because the same alleged affirmative misrepresentations underpin both the fraudulent and negligent misrepresentation claims, the claims rise and fall together. This Court thus addresses them together.

To state a claim for fraudulent misrepresentation in Florida, a plaintiff must allege: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the

16

representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Fuller v. Mortg. Elec. Registration Sys., Inc.*, 888 F. Supp. 2d 1257, 1276 (M.D. Fla. 2012) (internal quotation marks omitted) (quoting *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010)). The elements for negligent misrepresentation, in turn, are:

> (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

*Linville v. Ginn Real Est. Co., LLC*, 697 F. Supp. 2d 1302, 1307 (M.D. Fla. 2010) (quoting *Coral Gables Distrib., Inc. v. Milich*, 992 So.2d 302, 303 (Fla. 3d DCA 2008)).

To state a claim of either intentional or negligent misrepresentation, a plaintiff must demonstrate justifiable reliance. *See Foreline Sec. Corp. v. Scott*, 871 So. 2d 906, 910 (Fla. 5th DCA 2004). Importantly, when the alleged misrepresentations contradict the express terms of an ensuing agreement, reliance is unreasonable as a matter of law. *See Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007) (King, J.) (quoting *Eclipse Med., Inc. v. Am. Hydro–Surgical Instruments, Inc.*, 262 F.Supp.2d 1334, 1342 (S.D. Fla. 1999)). "[A] party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract." *Garcia*, 528 F. Supp. 2d at 1295 (internal quotation marks omitted) (quoting *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). That is because a plaintiff may not recover for such misrepresentations where "proper disclosure of the truth is subsequently revealed in a written agreement between the parties." *Equity Lifestyle Properties, Inc. v. Fla. Mowing And Landscape Serv., Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009).

17

Here, Defendants contend Plaintiffs rely on three affirmative misrepresentations to support their fraudulent misrepresentation and negligent misrepresentation claims: (i) Salu's representation that JAL was purchasing Parsons's talent and did not care about DAS's financials (Am. Compl. ¶19); (ii) Salu's statement that he would continue to manage DAS and maintain its status as a reliable digital marketing firm in the industry (*id.*); and (iii) Salu's assurance that the total purchase price resulting from DAS's sale would amount to between $2,100,000 and $2,300,000 (*id.* ¶ 26). Mot at 16.

Defendants contend that these alleged misrepresentations contradict the express language of the APA. *Id.* at 17. In support, Defendants point to specific provisions of the agreement, beginning with Sections 3.17 and 3.18, which state:

> **SECTION 3.17 DISCLOSURE.** The information provided by Seller and Selling Shareholders in connection with this Agreement, including, without limitation, the schedules hereto, and in any other writing pursuant hereto does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances under which they are made, not false or misleading. Copies of all documents heretofore or hereafter delivered or made available by Seller to Company pursuant hereto were or will be complete and accurate records of such documents. Seller has disclosed to Company all facts that are material to the financial condition, operation, or prospects of the Business, and the Assets.

> **SECTION 3.18 ACCURACY AND MATERIALITY OF REPRESENTATIONS, WARRANTIES AND COVENANTS.** No representation, warranty or covenant of Seller and Selling Shareholders contained in this Agreement or any other document prepared by Seller and delivered to Company incident to this Agreement contains any untrue statements of a material fact, or fails to state a material fact necessary in order to make the statements made in this Agreement or such document not misleading. Each of the representations, warranties and covenants contained in this Section 3 shall be deemed to be material to and have been relied upon by Company, and shall be binding and enforceable against Seller and Selling Shareholders.

18

ECF No. 16 at 23. According to Defendants, Salu's alleged misrepresentation that he was not interested in DAS's financials cannot be squared with these two provisions, which, when read together, state that "all facts that are material to the financial condition . . . of [DAS]" are "deemed to be material" to the APA. Mot. at 17–18. Defendants further argue that Salu's alleged misrepresentation that he would maintain DAS's status as a reliable marketing firm in the industry cannot sustain Plaintiffs' claims because Section 2.5(b) of the APA contemplates that DAS could be sold at any time. *Id.* at 18. That provision provides that, in the event of a subsequent sale of the business, JAS agrees to pay Plaintiffs "all amounts which could still be earned under the Earn-out date of the Acceleration Event." *Id.* at 18 (citing ECF No. 16 at 19). Lastly, Defendants point out that Salu's alleged misrepresentation regarding the ultimate purchase price contradicts Sections 2.5 and 2.6 of the APA, which set forth the purchase price and working capital adjustment. *Id.* at 18–29.

In the Response, Plaintiffs argue that the alleged misrepresentations do not contradict the express terms of the APA. Plaintiffs focus primarily on Salu's alleged misrepresentation concerning the total purchase price, citing not only the payment obligations under Sections 2.5 and 2.6 but also Section 2.2, which provides that all amounts in DAS's bank account as of the date of the APA belong to Korner. Resp. at 13. Plaintiffs ultimately contend that the alleged misrepresentations are consistent, complement, and explain the terms of the APA as Plaintiffs understood them before, during, and after they entered into the APA. *Id.* at 13–14.

Viewing Plaintiffs' allegations regarding Salu's alleged misrepresentations as true, this Court agrees with Defendants that the alleged misrepresentations contradict the terms of the APA such that Plaintiffs' reliance on them was unreasonable and unjustifiable as a matter of law. Moreover, although not highlighted by Defendants, this Court also notes that Section

6.4 of the APA expressly states that the APA contains "the entire agreement among the parties with respect to the Transactions and *shall supersede all previous oral and written and all contemporaneous oral negotiations, commitments and understandings.*" ECF No. 16 at 27 (emphasis added). This express statement alone renders Plaintiffs' reliance on Salu's misrepresentations unreasonable because Section 6.4 fully integrated any representations and accompanying documents into the APA and superseded any prior oral and written communications. Thus, Plaintiffs' reliance on Salu's pre-contract statements is unreasonable as a matter of law. "[I]t is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties." *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996) (finding reliance by plaintiff on pre-contract letter was unreasonable and unjustifiable where, among other things, the subsequent agreement between parties stated that all other representations were superseded by it, and, therefore, the letter was superseded and did not become part of the agreement).

Even without the above clause, the alleged misrepresentations identified in the Amended Complaint are inconsistent with the parties' agreement. For example, Salu's alleged statement that he was not concerned with DAS's financials contradicts the APA, which provides in Sections 3.17 and 3.18, that documents provided by Plaintiffs to Salu in the course of the negotiations are material to and have been relied upon by Salu. The alleged misrepresentation concerning Salu's continued management and maintenance of DAS is also contradicted by the APA, because Section 2.5(b) clearly contemplates that Salu could sell the business. Similarly, Salu's alleged misrepresentation that the purchase price would be between

$2,100,000 and $2,300,000 is inconsistent with Sections 2.5 and 2.6, which set forth the parties' final agreement on the purchase price.

As discussed above, where alleged pre-contractual misrepresentations contradict the parties' written agreement, those representations cannot be the basis for a fraudulent or negligent misrepresentation claim because reliance on those representations is unreasonable as a matter of law. For these reasons, this Court finds that Plaintiffs' reliance on Salu's alleged misrepresentations made prior to entering into the APA is unreasonable as a matter of law because the misrepresentations contradict and were not included in the APA. Therefore, Defendants' Motion is due to be granted as to Counts III and IV.

### D. Whether Plaintiffs' Unjust Enrichment Claim Can Proceed (Count V).

Defendants challenge Plaintiffs' claim for unjust enrichment (Count V), asserted against JAL, on grounds that, notwithstanding the fact that this claim was brought in the alternative to the breach of contract claim (Count I), unjust enrichment cannot survive where the parties do not dispute the existence of an express contract that addresses the same matters at issue in the unjust enrichment claim. *See* Mot. at 19–20.

To state a claim for unjust enrichment, a plaintiff "must allege 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022) (quoting *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)). "[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017).

"As a general principle, a plaintiff cannot pursue an implied contract theory, such as unjust enrichment . . . , if an express contract exists." *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 49 (Fla. 4th DCA 2021); *see also Team Servs. Inc. v. Securitas Elec. Sec., Inc.*, No. 22-12840, 2023 WL 6890660, at *11 (11th Cir. Oct. 19, 2023) ("[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists *concerning the same subject matter*." (emphasis added) (citation omitted))

Here, Plaintiffs argue that the existence of the APA does not defeat their unjust enrichment claim because, although the existence of the parties' agreement is undisputed, Defendants' use of the American Express cards and vendor lines of credit constitutes an "extra" performance that is not covered by the APA. *See* Resp. at 14–15. This Court disagrees.

Here, in the breach of contract claim, Plaintiffs allege that JAL is liable because, among other things, it used DAS's American Express cards. Am. Compl. ¶ 49. The unjust enrichment claim, in turn, alleges that JAL is liable because it used DAS's lines of credit, including the American Express Cards, to pay DAS's vendors. *Id.* ¶ 74. Thus, because there is no dispute that an express contract exists between the parties and because the Amended Complaint's unjust enrichment claim is premised on the same allegations that are the basis for the breach of contract claim. Plaintiffs are precluded from pursuing the unjust enrichment claim. *See Houston v. Centene Mgmt. Co., LLC*, No. 19-CIV-20620-RAR, 2019 WL 7971713, at *3 (S.D. Fla. Oct. 20, 2019) (Ruiz, J.); *Apollo Mgmt. Grp. v. Croxall*, No. 22-62398-CIV, 2023 WL 11799718, at *6 (S.D. Fla. Mar. 29, 2023) (Dimitrouleas, J.).

For these reasons, Defendants' Motion to Dismiss is due to be granted as to the unjust enrichment claim, and Count V is due to be dismissed.

### E.   Whether The Amended Complaint Adequately Pleads An Accounting Claim (Count VI).

Lastly, Defendants argue that dismissal of the accounting claim (Count VI) against JAL is warranted because Plaintiffs fail to adequately allege that the transaction memorialized in the APA is sufficiently complex and because the APA provides an adequate remedy at law.[4] *See* Mot. at 20–21.

"A party seeking an equitable accounting must show the existence of a fiduciary relationship or a complex transaction and must demonstrate the inadequacy of the legal remedy." *Staup v. Wachovia Bank, N.A.*, No. 08-60359-Civ, 2008 WL 2598005, at *4 (S.D. Fla. June 27, 2008) (Cohn, J) (citing *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990)). A plaintiff "who depends upon complexity to confer jurisdiction upon a court of equity, must allege . . . facts which show, not only a lengthy account, but one which is so difficult and complicated as to be beyond the ken of jury trial." *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1281 (S.D. Fla. 2010) (Seitz, J.) (quoting *Huebener v. Chinn*, 207 P.2d 1136, 1148 (Or. 1949)). Moreover, "[w]here a party [has] the opportunity to establish their damage claim through discovery, a request for accounting is not appropriate." *Managed Care Solutions*, 694 F. Supp. 2d at 1281 (second alteration in original) (quoting *Centrix HR, LLC v. On-Site Staff Mgmt., Inc.*, No. CIV. A. 04-5660, 2008 WL 2265266 (E.D. Pa. June 3, 2008)).

Plaintiffs contend that the Amended Complaint sets forth sufficient allegations concerning the complexity of the transaction at issue and that there is no adequate remedy at

---

[4] Although Defendants also assert that Plaintiffs' accounting claim fails because the Amended Complaint failed to sufficiently allege that JAL owes them a fiduciary duty, the undersigned does not address this part of Defendants' argument given the Court's finding herein that the fiduciary duty claim against JAL fails on independent tort doctrine grounds.

law because no method exists by which Plaintiffs can verify the additional earn-out payments under the APA. *See* Resp. at 17–18. Plaintiffs aver that Defendants have refused to cooperate with Plaintiffs and have retained the financial documentation necessary to calculate such payments.

On the issue of complexity, this Court looks to the APA. The APA provides the method for calculating the additional earn-out payments, and, reviewing the APA, this Court finds that "a calculation of damages in this action is not a complicated endeavor." *Managed Care Solutions*, 694 F. Supp. 2d at 1280; *see also Immediate Cap. Grp., Inc. v. Spongetech Delivery Sys., Inc.*, No. 10-60059-CIV, 2010 WL 1644952, at *2 (S.D. Fla. Apr. 22, 2010). While Defendants may not have made all of the necessary documents available to Plaintiffs, that does not mean there is no adequate remedy at law. Rather, it suggests that discovery is what Plaintiffs need to establish their damages. *See Cont'l Cas. Co. v. First Fin. Emp. Leasing, Inc.*, 716 F. Supp. 2d 1176, 1194 (M.D. Fla. 2010) ("[A]n equitable accounting is not a substitute for discovery available and permitted under the Federal Rules of Civil Procedure."). Against this backdrop, Plaintiffs' assertion that "traditional discovery procedures would be maladapted to this situation" (Resp. at 16) does not negate their ability to establish their damages through discovery. *Managed Care Solutions*, 694 F. Supp. 2d at 1281 ("A legal remedy cannot be characterized as inadequate merely because the measure of damages may necessitate a look into [the defendant's] business records." (alteration in original) (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962))).

This Court agrees that neither the APA nor the calculation of damages in this case is sufficiently complex and that Plaintiffs may obtain information to determine damages through discovery. Therefore, this Court concludes that the Amended Complaint fails to state

a claim for accounting, and Defendants' Motion to Dismiss is due to be granted as to Count VI of the Amended Complaint.

####  F.      Leave to Amend.

The Amended Complaint is the second iteration of Plaintiffs' pleading since, as noted above, Plaintiffs amended the original complaint as a matter of course after Defendants filed their first motion to dismiss [ECF No. 5]. Plaintiffs have not requested leave to amend, nor have they indicated any inclination to do so. *See Wagner v. Daewoo Heavy Industries Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."). Moreover, some of the legal impediments to Plaintiffs' claims discussed above cannot be cured by more artful pleading, such that amendment would be futile. Therefore, leave to amend is neither available nor warranted here. *See Spaulding v. Poitier*, 548 F. App'x 587, 594 (11th Cir. 2013) (holding that there was no abuse of discretion in denying plaintiff leave to amend his complaint because such an amendment would have been futile (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007))); *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (observing that courts "properly deny leave to amend the complaint under [Federal Rule of Civil Procedure] 15(a) when such amendment would be futile . . . [such as] 'when the complaint as amended is still subject to dismissal.'" (first citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); and then quoting *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999))).

## IV.    CONCLUSION

For the reasons set forth above, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss [**ECF No. 18**] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.      Count II of the Amended Complaint is **DISMISSED WITH PREJUDICE** as to Defendant JAL but remains as to Defendant Salu;

2.      Counts III through VI are **DISMISSED WITH PREJUDICE** as to both Defendants; and

3.      Defendants shall file an Answer to the remaining claims **within fourteen (14) days** of the date of the instant Order.

**DONE AND ORDERED** in Chambers in the Southern District of Florida this 11th day of February, 2025.

**MELISSA DAMIAN**
**UNITED STATES DISTRICT JUDGE**

CC: Counsel of Record

26